METRO LIGHTS, L.L.C., Plaintiff,

v.

CITY OF LOS ANGELES, Defendant.

No. CV 04–1037 GAF (Ex).

United States District Court,
C.D. California.

Aug. 11, 2006.

Paul E. Fisher, Fisher and Associates, Newport Beach, CA, for Plaintiff.

Jeri L. Burge, Kenneth T. Fong, Rockard J. Delgadillo, Los Angeles City Attorney's Office, Los Angeles, CA, for Defendant.

**AMENDED** MEMORANDUM AND ORDER RE: PLAINTIFF'S AND DEFENDANT'S CROSS–MOTIONS FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

FEESS, District Judge.

## I.

## INTRODUCTION[1]

Defendant City of Los Angeles (the "City") has enacted a "Sign Ordinance" that imposes a total ban on newly constructed "off-site signs," which are defined as commercial signs located primarily (but not necessarily) on private property, that advertise anything other than products offered for sale on the premises where the sign is erected. Expressly and conspicuously exempt from the ban are structures erected on public rights of way and those erected under contract with various City entities. L.A.M.C. §§ 91.101.4, 91.101.5. This ban dramatically impacts Plaintiff Metro Lights, L.L.C. ("Plaintiff" or "Metro Lights"), which owns numerous such sign locations throughout the City.

Metro Lights asserts that the Sign Ordinance, which allegedly furthers substantial governmental interests in traffic safety and aesthetics, exists not to serve those purposes but rather to allow the City to generate revenue by exercising a monopoly over off-site signs within the City. In support of this assertion, Metro Lights has established that, approximately six months

---

1. This Amended Order contains minor revisions to encompass within its analysis the Los Angeles Municipal Code provision, not previously cited or discussed by the City, that explicitly exempts from the Sign Ordinance's scope structures erected on public rights of way and those erected pursuant to a contract with various City entities. *See* L.A.M.C. §§ 91.101.4, 91.101.5. This statutory exemption, *which was brought to the Court's attention only after the March 7, 2006 summary* *adjudication Order was issued,* actually strengthens the Court's conclusion since it makes express what this Court otherwise considered a "de facto" exception. Thus, this Amended Order in no way alters the Court's ultimate conclusion that the City's Sign Ordinance violates the First Amendment because it fails the test established by the United States Supreme Court in *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

before enacting the blanket ban on off-site signs, the City entered into a contract under which a private media company, Viacom Decaux, L.L.C. ("Viacom") undertook at its own cost to repair and replace a number of existing bus shelters, and to build several thousand new bus shelters, kiosks and amenities, in exchange for the exclusive right for a period of 20 years to sell and display advertising on this so-called "Street Furniture." In short, the contract permitted Viacom to erect off-site signs on the Street Furniture it constructed under its agreement with the City, and the Sign Ordinance ensured that Viacom would have no competitors in the off-site marketplace.

This case comes before this Court because the City, pursuant to the Sign Ordinance, has cited Plaintiff for allegedly violating the ban on off-site signs. Metro Lights acknowledges that the City may place limits on commercial speech so long as it complies with the requirements of *Central Hudson*, and the City concedes that *Central Hudson* states the proper test for analyzing the constitutionality of its ordinance. (10/31/05 Tr. [Summary Adjudication Hearing] at 21:20–22 ("[W]hen the dust settles on this case it really does always come back to *Central Hudson*.")) Metro Lights contends, however, that the City cannot satisfy that test because the policy reflected in the Sign Ordinance is substantially undermined by the City's contract with Viacom permitting off-site signs on Street Furniture. The City defends against the suit principally by asserting that: (1) the Sign Ordinance meets the *Central Hudson* test because it directly advances a substantial governmental interest in a narrowly tailored fashion; and (2) the Street Furniture contract cannot be compared with, and is not an exception to, the off-site sign ban since that ban applies only to signs on private property, not signs that appear on Street Furniture in public rights of way.

The Court is now presented with cross-motions for summary judgment. Plaintiff initially moved for summary judgment, which was fully opposed by Defendant. Defendant has since filed its own motion for summary judgment, to which no opposition has yet been filed because the Court sees no need for further briefing on the issues. Defendant's motion is simply the mirror image of Plaintiff's initial motion, and it reflects the same arguments made in opposition to the motion presented by Plaintiff. The respective positions of the parties are clearly presented, the factual record is well-developed, and the Court is in a position where it can address all of the issues raised in both motions.

The Court has little doubt that, if this case were only about the Sign Ordinance in the absence of the Street Furniture Agreement, Plaintiff could not prevail on its First Amendment challenge. The ordinance appears directed at precisely the kinds of concerns that, under *Central Hudson* and its progeny, justify the imposition of limits on commercial speech. The Sign Ordinance, however, does not exist in a vacuum. The question raised by the City's conduct in this case is whether, as required by *Central Hudson*, the Ordinance "directly advances" a substantial governmental interest in a manner that reaches no further than necessary to attain that objective where the City's agreement with Viacom tends to negate the very benefits—traffic safety and protection of the visual environment—that the Ordinance was designed to promote. Stated more simply, the question is this: Can the City use *Central Hudson* as a shield to defeat constitutional challenges to its Sign Ordinance while collecting revenue from a different media company engaged in conduct that appears, on its face, to violate the express terms and purposes of the Ordinance?

The Court concludes that, however the question is stated, the answer is "no." The United States Supreme Court, in addressing the proper scope of limitations on commercial speech, has held that governmental entities may not impose limits on commercial speech to achieve supposed ends that are undermined by other governmental policies. *Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 188–90, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999). In the present context, the City cannot engage in conduct that is so inconsistent with, and indeed substantially undermines, the principal objectives of the Sign Ordinance and at the same time enforce that Ordinance against Metro Lights. The Court therefore concludes that Plaintiff's motion for summary adjudication on the First Amendment issue should be **GRANTED** and that Defendant's cross-motion for summary judgment should be **DENIED** as to the First Amendment issue, but **GRANTED** as to Plaintiff's Equal Protection claim.

## II.

## STATEMENT OF FACTS

Because Metro Lights's challenge to the Sign Ordinance focuses largely on the agreement between the City and Viacom, the Court begins its discussion of the facts with a very brief summary of the use of bus benches and associated structures, so-called Street Furniture, for advertising purposes.

### A. History of Street Furniture Advertising in the City

Until relatively recently, bus benches were installed throughout Los Angeles by various companies under agreements from

which the City realized no significant monetary, aesthetic, or other benefit. (Statement of Genuine Issues ("SGI") ¶ 32; Oishi Decl. ¶ 12). There were virtually no patron-related amenities at bus stops because the costs associated with the capital investment, coupled with the ongoing maintenance and liability costs, were too high. (SGI ¶ 39; Oishi Decl. ¶ 19).[2]

A major change occurred in 1987 when the City first sold the rights to advertise on bus benches through its Transit Shelter Contract with Shelter Media Communications, Inc. ("SMCI"), (SGI ¶ 25; Oishi Decl., Ex. A [Transit Shelter Contract] at 1). That contract granted SMCI the "exclusive right to display advertising materials on the [transit] shelters." (*Id.*). Similarly, in May 1999, the City entered into the Norman Bus Bench Franchise Agreement (the "Norman Agreement"), (SGI ¶ 27; Oishi Decl., Ex. D [Norman Agreement]), which gave the franchisee the exclusive right to place commercial advertising on bus benches in the City. (Oishi Decl., Ex. D [Norman Agreement] at § 4.3.1). In exchange, the franchisee was required to: (1) pay the City annually $245,626 plus a percentage of the franchisee's annual gross cash receipts, (*id.* at § 4.3.6.2); and (2) place advertising or public service announcements on all bus benches. (*Id.* at § 4.3.16.1).

### B. The Street Furniture Agreement

Over time, as the value of the City's Street Furniture as an advertising medium became more apparent, the City became more sophisticated in the sale of these rights by putting the contract out to bid.

---

**2.** After the City responded to Plaintiff's statement of uncontroverted facts, the City set forth additional facts in SGI ¶¶ 24–45, many of which Plaintiff did not respond to in its

Reply. Regardless, these facts are immaterial since they address the history of city advertising contracts and have no effect on the legal issues presented in these cross-motions.

### 1. THE AUCTION AND BIDDING PROCESS FOR THE STREET FURNITURE PROGRAM

The City invited all qualified firms to submit bids for either a 15- or 20-year City-wide Street Furniture Program that included installing and maintaining automated public toilets, kiosks, news racks, and transit shelters. (SGI ¶ 29; Oishi Decl., Ex. F [Coordinated Street Furniture Request for Proposal ("RFP")] at 7). The City's objective in seeking a single contractor to undertake the program was to establish a single point of accountability and to improve the appearance and quality of the Street Furniture in the City so that it is not only aesthetically pleasing, but also styled to harmonize with the surrounding neighborhoods. (Oishi Decl., Ex. F[RFP] at 18, § 4.1). The bidding parties were advised that the City would retain authority to control certain aspects of the content of the signs, (SGI ¶ 19), and the City in fact retained the ability, through the issuance of permits, to dictate the locations within the City where the Street Furniture would be installed. (Oishi Decl., Ex. E [Coordinated Street Furniture Agreement] at § 4.2.1). The City does not dispute this fact. (*See* SGI ¶ 19).

More than two dozen outdoor advertising companies initially responded to the invitation and participated in the bidding process. (Oishi Decl. ¶ 9).

### 2. THE CITY'S AGREEMENT WITH VIACOM

On December 21, 2001, the City and Viacom entered into a 20-year agreement for Coordinated Street Furniture (the "Agreement" or "Street Furniture Program" or "Street Furniture Agreement"), which remains in force. (SGI ¶ 29; Oishi Decl., Ex. E [Coordinated Street Furniture Agreement]). The Agreement grants Viacom the exclusive right to place thousands of advertising signs on Street Furniture in public rights of way through-

out the City. (SGI ¶¶ 7–8, 22). These advertisements fall within the definition of off-site signs because they advertise goods, services, and entertainment events not offered for sale on the premises where the advertisement is located.

As intended, the contract established the most extensive Street Furniture program in the City's history. Whereas the Norman Agreement only addressed advertising on bus benches, the Street Furniture Program authorized Viacom to advertise, or sell advertising, on a variety of Street Furniture. (*Compare* Oishi Decl. Ex. E [Coordinated Street Furniture Agreement] *with* Ex. D [Norman Agreement]).

In exchange for its exclusive rights under the Agreement, Viacom agreed to replace old bus shelters and to build and maintain several thousand new bus shelters, kiosks, and amenities at its own expense, and to pay the City a minimum annual fee starting at $3,000,000 in the first year, and escalating to $11,500,000 in year 20. (SGI ¶ 10; Oishi Decl., Ex. E [Coordinated Street Furniture Agreement] at 18–19). Over the 20-year period of the contract, the minimum yearly payments total $150,000,000. (*Id.*).

As noted, the City retained some authority to control certain aspects of the content of the signs, (SGI ¶ 19), including a selective ban on advertising containing tobacco or alcohol content, *"unless the [City in its discretion] grants permission otherwise."* (Oishi Decl., Ex. E [Coordinated Street Furniture Agreement] at § 4.3.7(a) (emphasis added); SGI ¶ 19).

### C. THE CITY'S BAN ON ALL NEW COMMERCIAL OFF-SITE SIGNS

Not long after the City entered into this agreement with Viacom, the City banned any new construction of off-site signs within its limits.[3] Recently, the City brought to the attention of this Court that, through

---

**3.** Specifically, an off-site sign is defined as "a sign which displays any message directing

attention to a business, product, service, pro-

its ordinance, it expressly exempts structures erected on public rights of way and through contracts between various City entities from the definition of off-site signs, and therefore that such signs would not fall within the definition of this otherwise City-wide ban. *See* L.A.M.C. §§ 91.101.4, 91.101.5. The present case focuses on the constitutionality of this ban under the First Amendment and relevant case law.

The City regulates outdoor signs through a comprehensive group of ordinances, known collectively as the "Sign Ordinance." *See* L.A.M.C. §§ 91.6201.1 91.6201.2 ¶¶ 1–2, 6; (SGI ¶¶ 1–3). About six months after the City entered into the Street Furniture Agreement with Viacom, the City enacted a City-wide ban on billboards and other off-site commercial signs for the purported *purpose of improving traffic safety and reducing visual clutter.* (Request for Judicial Notice ("RFJN"),[4] Ex. B [Los Angeles City Ord. No. 174547; L.A.M.C. §§ 91.6201–91.6218] ). This ban took effect on June 10, 2002. The ban imposes criminal penalties for each violation and each day during which such violation is committed and continues. (RFJN, Ex. A [L.A.M.C. Sign Ordinance] at § 91.6202.2).

### 1. Purpose of the Ban

The ban expressly articulates its purposes as follows:

The purpose of [the ban] is to promote public safety and welfare by regulating signs in keeping with the following objectives: (1) [t]hat the design, construction, installation, repair and maintenance of signs *will not interfere with traffic safety or otherwise endanger public safety,* (2) [t]hat the regulations will provide *reasonable protection to the visual environment* while providing adequate conditions for meeting sign users['] needs; (3) [t]hat incompatibility between signs and their surroundings will be reduced; (4) [t]hat both the public and sign users will benefit from signs having *improved legibility, readability and visibility;* (5) [t]hat consideration will be given to *equalizing the opportunity for messages to be displayed,* and (6) [t]hat adequacy of message opportunity will be available to sign users without dominating the visual appearance of the area.

(RFJN, Ex. A [L.A.M.C. Sign Ordinance] at § 91.6201.2 (emphases added)). The ordinance also prohibits any sign that "constitutes a hazard to the safe and efficient operation of vehicles upon a street." (*Id.* at § 91.6205.5.1).

### 2. Scope of the Ban

The Sign Ordinance distinguishes between off-site and on-site signs. (RFJN, Ex. A [L.A.M.C. Sign Ordinance] §§ 91.6201.3, 91.6203; SGI ¶ 4). An off-site sign is one that directs attention to goods, services or other commercial activities, which may be found at some location *other* than where the sign itself is located. (RFJN, Ex. A [L.A.M.C. Sign Ordinance] § 91.6203; SGI ¶ 5). The ordinance applies to all *new* off-site signs (RFJN, Ex. A [L.A.M.C. Sign Ordinance] at § 91.6205.11; SGI ¶ 6).[5] That is, existing

---

fession, commodity, activity, event, person, institution or any other commercial message which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located." (RFJN, Ex. A [L.A.M.C. Sign Ordinance] at § 91.6203).

**4.** The Court may take judicial notice of documents that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201; *United States v. Wilson,* 631 F.2d 118 (9th Cir.1980). The Court hereby takes judicial notice of Plaintiff's Exhibits A–F.

**5.** "Signs are prohibited if they ... [a]re off-site signs, except when off-site signs are specifically permitted pursuant to a variance, le-

off-site signs were permitted to remain pursuant to a variance, but were indirectly and eventually eliminated as they became non-conforming. Moreover, the ban applies only to commercial off-site signs and does not implicate noncommercial advertisements.[6] (RFJN, Ex. A [L.A.M.C. Sign Ordinance] at § 91.6203).

At the time the City's ban took effect, there were approximately 18,500 transit stops located in the City, many of which contained benches or transit shelters with commercial advertising on them. (SGI ¶ 31; Oishi Decl. ¶ 11). Without citing to any evidence, the City simply asserted that the Sign Ordinance applies only to private property and not to the public rights of way on which the City's Street Furniture is located. (SGI ¶ 21). In fact, as supporting evidence to dispute Plaintiff's contention that the Sign Ordinance only applied to private property, the City conspicuously failed to cite L.A.M.C. §§ 91.101.4, 91.101.5, which explicitly exempted such structures located on public rights of way from the definition of "off-site" signs. (See id.). These provisions came to the Court's attention after the original March 7, 2006 summary adjudication ruling, which caused this Amended and clarifying Order to issue. This additional evidence, however, only reinforces the Court's ultimate conclusion that the Sign Ordinance violates *Central Hudson.*

### 3. EFFECT OF THE BAN—THE EXCEPTION FOR VIACOM

Although the City's ban purports to prohibit all new off-site signs, the City allows thousands of off-site signs to be displayed on existing bus shelters and freestanding kiosks, which are located on public rights-of-way throughout the City, through its exclusive contract with Viacom. (*Id.* ¶ 20). That public rights of way and contracts with City entities are expressly exempted from the official definition of an off-site sign does not change the fact that Viacom and the City are permitted to control the content of commercial advertisements. (*See id.* ¶ 19). On the contrary, it codifies what the Court previously viewed to be the de facto effect of the City's Sign Ordinance.

### D. PLAINTIFF'S OUTDOOR ADVERTISING BUSINESS

Plaintiff sells advertising space on its outdoor signs, which are erected on property leased from private owners throughout the City of Los Angeles and California. (*Id.* ¶ 12). National and local advertisers buy space on Plaintiff's signs in order to display a variety of messages, including the commercial messages at issue in this case. (*Id.* ¶ 13; Rush Decl. ¶ 4; *see also* Neighbors Decl. ¶ 8). Plaintiff owns numerous existing real property sites where it operates and maintains off-site signs within the City, some of which currently violate the City's ban. (SGI ¶ 14; Rush Decl. ¶ 3). In addition, Plaintiff has leased

---

gally adopted specific plan, supplemental use district or an approved development agreement. This shall also apply to alteration or enlargements of legally existing off-site signs." (RFJN, Ex. A [L.A.M.C. Sign Ordinance] at § 91.6205.11(11); *see also id.,* Ex. B [Amendment to Sections 12.21 and 91.6205.11] at § 1(7)(*l* )).

6. The definition of off-site under L.A.M.C. § 91.6203 is limited to signs containing com-

mercial messages. *See Clear Channel Outdoor, Inc. v. City of Los Angeles,* 340 F.3d 810, 815 (9th Cir.2003) ("[T]he recent amendment striking the words 'or noncommercial' from the definition of 'Off–Site Sign' in L.A.M.C. § 91.6203 ... is important because it makes it impossible that a noncommercial sign would be designated an 'off-site' sign.... In effect, the amendment creates an exemption for noncommercial off-site signs.").

other locations from property owners throughout the City, and the ban prevents Plaintiff from lawfully using these locations for off-site signs. (SGI ¶ 15). Thus, these other locations remain vacant. (*Id.*).

Beginning around December 2003, the City learned that Metro Lights installed off-site commercial signs on private property at a number of sites within the City without obtaining building or electrical permits as required. (*Id.* ¶ 44; Neighbors Decl. ¶ 6). The City issued Plaintiff numerous citations for violating the Sign Ordinance. (Rush Decl., Ex. B [Orders to Comply]).

### E. THE EFFECT OF THE STREET FURNITURE SIGNS

#### 1. SIZE AND PLACEMENT

Plaintiff's off-site signs are the same size as the advertising signs that the City allows on its Street Furniture. (SGI ¶ 16). However, many of the City's off-site signs are located on public sidewalks, and are therefore *closer to traffic lanes* than Plaintiff's signs, which are located on private property and set back from the street. (*Id.* ¶ 17).

#### 2. EFFECTS

Given their placement, the signs installed on City-owned property by Viacom *may* represent a *greater traffic hazard* than the signs owned and maintained by Plaintiff, (*Id.* ¶ 18). Each side advances expert opinions of the ban's effect on traffic safety and aesthetics.

Plaintiff presents the declaration of a registered traffic safety engineer with 30 years experience who concludes that some of Viacom's signs on City property actually pose a greater threat to traffic safety than Plaintiff's off-site signs located on private property. (Kunzman Decl. ¶ 14). Plaintiff's engineer conducted a study of seven separate locations where Metro Lights has signs located in Los Angeles. (*Id.* ¶ 4).

At each location, he found signs on Street Furniture with the exact dimensions of those displayed by Metro Lights. (*Id.*). All of the City's signs were closer to the curb; on average, Metro Lights's signs were more than three times farther from the curb face than the bus shelter signs, the former averaging 19.3 feet from the curb and the latter averaging 5.3 feet away. From this, the engineer notes that the bus shelter signs are *more visible* to a driver than Metro Lights's signs, and therefore "potentially a greater distraction than any of the signs owned and operated by Metro Lights." (*Id.* Deck ¶¶ 5–8, 14 & Ex. C; Mot. at 10).

The City, in contrast, presents the declaration of the Contract Administrator of the Street Furniture Agreement, a registered Landscape Architect in charge of managerial oversight of the Street Furniture Program, who states that "the advertising panels on the new [S]treet [F]urniture may not cause any more traffic and public safety impacts than the advertising on the old [S]treet [F]urniture." (Oishi Decl. ¶¶ 2, 24). This statement is based on the flawed premise that the Street Furniture Program only replaces old Street Furniture, and therefore cannot cause any more increased traffic or safety impacts than the old furniture. (*Id.* ¶ 24; Oishi Decl., Ex. E[Street Furniture Agreement] at § 4.2).

### III.

### DISCUSSION

#### A. THE LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). All justifiable inferences are made in favor of the non-moving party, and the moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment may be granted on part of an action, *Lewis v. Anderson,* 615 F.2d 778 (9th Cir.1979), including questions of liability. *KMLA Broad. v. Twentieth Century Cigarette Vendors,* 264 F.Supp. 35 (C.D.Cal.1967).

■ A party opposing a properly made and supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). An issue is genuine if evidence is produced that would allow a reasonable jury to reach a verdict in favor of the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Only admissible evidence may be considered on a motion for summary judgment. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1550 (9th Cir.1989). The Court will assume the truth of direct evidence set forth by the opposing party, *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 507 (9th Cir.1992), but where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

In order to succeed on a plaintiff's motion for summary judgment, that plaintiff " 'must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [its] favor.' " *United States ex rel. Jordan v. Northrop Grumman Corp.,* No. 95–2985(ABC), 2002 U.S. Dist. LEXIS 26674, at *18–*19 (CD.Cal. Aug. 5, 2002) (quoting *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986)). Stated another way, because Plaintiff has the burden of proof at trial, he "must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Id.* (citations and quotation marks omitted).

The Court will view the evidence in the light most favorable to the defendant. *S. Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir.2003). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Indep. Cellular Tel., Inc. v. Daniels & Assocs.,* 863 F.Supp. 1109, 1114 (N.D.Cal.1994).

## B. THRESHOLD DISPUTES

As an initial matter, the City argues that Plaintiff's motion is procedurally improper because: (1) it would prejudice the City since the City has not yet taken discovery related to whether this litigation is moot since discovery could uncover that Plaintiffs signs are disallowed under zoning and building code regulations; and (2) Plaintiff allegedly misrepresented to the Court and the City in the Joint Scheduling Conference Report that this matter would likely be disposed of by cross-motions for summary judgment. (Opp. at 7).

### 1. THE STANDARD

■ Rule 56(f) permits a party to oppose a motion for summary judgment by demonstrating that it needs time for additional discovery. To obtain such relief, the opposing party's declarations must show that it "cannot for reasons stated present by affidavit facts essential to justify the party's opposition," and the Court may deny the motion for summary judgment or continue the hearing to allow additional discovery. Fed.R.Civ.P. 56(f). However, courts do not routinely grant Rule 56(f) requests on the perfunctory assertion that

the party cannot respond because it needs to conduct discovery.

References in memoranda and declarations to a need for discovery do not qualify as motions under Rule 56(f). Rule 56(f) requires affidavits setting forth the particular facts expected from the movant's discovery. Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment. *Brae Transp., Inc. v. Coopers & Lybrand,* 790 F.2d 1439, 1443 (9th Cir.1986). In short, the opposing party must explain with particularity why it is unable to oppose the motion, state with specificity what facts it intends to seek through discovery, and show how its discovery efforts are reasonably expected to create a triable issue. *See In re Silicon Graphics Litig.,* 183 F.3d 970, 989 (9th Cir.1999); *Keebler Co. v. Murray Bakery Prods.,* 866 F.2d 1386, 1389 n. 5 (Fed.Cir.1989).

As discussed below, the City has not met this standard.

## 2. DISCOVERY AND MOOTNESS

■ The City claims that further discovery will demonstrate that Plaintiff's signs are disallowed under zoning and building regulations, reasons separate and independent of the City's ban on off-site signs, including: (1) the City's sign location and spacing rules that require a certain distance between commercial signs to reduce cluttering, (RFJN, Ex. A [L.A.M.C. Sign Ordinance] §§ 91.6218.2, 91.6218.4); (2) City specific plans that would independently prohibit the off-site signs, (*id.* § 91.6205.11.11); or (3) the absence of a lease for a sign site, (Fong Decl. ¶ 6). For that reason, the City asserts it must discover the precise location of all of Plaintiffs signs, claiming that Plaintiff has erected additional signs since the injunction was issued. However, for multiple reasons ad-

ditional discovery need not be ordered in this case.

First, Plaintiff only admits to having "leased additional sites for the installation" of signs, rather than admitting to actually having erected new signs, and the City offers no evidence to support its conclusion that new signs have actually been erected in violation of these other ordinances. (*See* Mot. at 8). Indeed, contrary to the City's accusation, Plaintiff provides a declaration that it has not proceeded with the placement of any new signs due to the City's off-site ban. (Rush Decl. ¶ 3).

Second, in making its argument that numerous signs erected and displayed by Plaintiff violate aspects of the Sign Ordinance other than the off-site sign ban, (SGI ¶ 45; Opp. at 9; Neighbors Decl., Ex. A [Metro Lights Sign Locations and Corresponding Code Violations] at 4–5), the City has acknowledged that it knows the location of all of Plaintiffs signs listed in the injunction. (*Id.;* Opp. at 8).

Third, the City has recently issued numerous citations against Plaintiff for violations of local law, but all of those citations involve allegations that Plaintiff has violated the Sign Ordinance, L.A.M.C. § 91.6205.11.11, not any of the other ordinances whose alleged violation gives rise to the need for additional discovery. (Rush Decl., Ex. B [Order to Comply]). Thus, the City appears to have neither a need for further discovery nor any intention of enforcing any ordinance against Metro Lights other than the off-site sign ban.

Moreover, even if the City actually needed the discovery, its belated insistence on the necessity of delaying the resolution of the current motion is insufficient to warrant the requested relief. The current action was filed on February 17, 2004, and had been pending for nearly 20 months when Metro Lights filed its motion. Thus, the City had ample opportunity to conduct

discovery on the aforementioned issues, which it claims may render this lawsuit moot. However, for whatever reason, the City failed to do so.

 Finally, in context, the argument in favor of a continuance is beside the point. The City's numerous citations accusing Plaintiff of violating the off-site sign ban demonstrate that the issue is not moot, since there is an ongoing controversy between the parties over compliance with the off-site sign ban. Moreover, even if the City were to dismiss every outstanding citation against Metro Lights, such action would not moot this case. As the Supreme Court has noted, the voluntary cessation of challenged conduct moots a case only where it is *"absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Adarand Constructors, Inc. v. Slater,* 528 U.S. 216, 221, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000) (bold emphasis added); *see also* Erwin Chemerinsky, *Federal Jurisdiction,* §§ 5.5.3–5.5.4 at 131–140 (4th ed. 2003) ("Chemerinsky, *Federal Jurisdiction* "). That is, even dismissal of every citation would not deprive Plaintiff of standing to pursue its challenge to the off-site sign ban. Standing to challenge allegedly wrongful conduct is determined at the time the suit is filed, *Senter v. Gen. Motors Corp.,* 532 F.2d 511, 520 (6th Cir.1976), and is satisfied where the threatened injury— enforcement of the off-site sign ban—is likely to recur. *Armstrong v. Davis,* 275 F.3d 849, 861 (9th Cir.2001). Thus, while the City might have grounds other than the off-site sign ban for citing Plaintiff, that fact does not operate to resolve the issue now before the Court. The Court therefore will not continue the matter to allow for discovery that it would not permit in the first instance.

### 3. MISREPRESENTATION

The City also claims that Plaintiff misrepresented its intentions in the Joint Scheduling Conference Report filed July 7, 2005, in stating that the matter would likely be disposed of by cross-motions for summary judgment. Instead, the City claims Plaintiff filed its motion without coordinating a cross-motion with the City and that failure even to consult the City violates Local Rule 7–3. (Opp. at 10).

However, Plaintiff avers that the parties met and conferred regarding the timing of the hearing on Plaintiff's motion for partial summary judgment, and that these discussions broke down. Additionally, Plaintiff claims that the City's previous *ex parte* application to continue the hearing made no mention of a need for additional time to allow the City to bring its own coinciding motion for summary judgment.

The Court concludes that it can properly address and resolve Plaintiff's motion for summary judgment, as Plaintiff is entitled to bring its own motions and the Court does not find any affirmative misrepresentation by Plaintiff. Moreover, the City has now filed its own motion which raises essentially the same issues presented in Plaintiff's motion, which presents the Court with virtual cross-motions. This Order will resolve the entire controversy.

### C. THE STREET FURNITURE PROGRAM'S EFFECT ON THE BAN'S CONSTITUTIONALITY

The City has two arguments as to why the Street Furniture Program is not even subject to the City's ban on off-site signs. First, the City argues that the Street Furniture Program is long-standing, independent of the newly enacted ban, and therefore not subject to the ban. Since the Street Furniture Program previously existed and is not subject to the ban, on this basis the City insists that it does not constitute an "exception" to the ban and has

no bearing on the Sign Ordinance's constitutionality. (Opp. at 10). Second, the City argues that the Street Furniture Program is not subject to the ban because it does not add any new net signage, and therefore has no role in the analysis of the constitutionality of the off-site sign ban. For these broad propositions, the City cites no legal authority—at least before the filing of its motion for reconsideration.

## 1. THE STREET FURNITURE PROGRAM'S INDEPENDENCE FROM THE NEWLY ENACTED BAN HAS NO EFFECT ON THE CONSTITUTIONAL ANALYSIS

The City correctly asserts that the Street Furniture Program was enacted prior to the effective date of the off-site sign ban and argues that this Program simply continues the Norman Agreement and the Transit Shelter Contract. The City points to several facts, including the similarities between the old programs and the new Street Furniture Program such as the relatively similar size of the billboards authorized under the various contracts. From the chronology and the similarities to the older programs, the City claims that the Street Furniture Program has no connection to the ban. The City overstates the facts, and provides no support for its legal conclusion.

As a matter of fact, none of the earlier contracts were nearly so extensive, or so lucrative for the City, as the City's current agreement with Viacom. Likewise, none of the earlier contracts so clearly focused on encouraging the erection of off-site signs on Street Furniture. But even assuming that each of these earlier agreements allowed the erection of off-site signs, that fact has nothing to do with the legal change that occurred in 2002 when the City banned new off-site signs throughout Los Angeles, making the City's contractor the sole vendor of off-site advertising space within the City's limits. More specifically, the City's argument does not address: (1) the critical elements of the *Central Hudson* test which permit only narrowly tailored limitations on commercial speech for the sole purpose of directly advancing a substantial governmental interest; or (2) the anomaly of enacting a ban on certain kinds of signs to achieve certain focused governmental objectives while allowing the City-chosen private contractor to erect the same kinds of signs throughout the City. For these reasons, the historical argument has no persuasive effect.

## 2. THE STREET FURNITURE PROGRAM'S ALLEGED LIMITED EFFECT ON NEW SIGNAGE HAS NO BEARING ON THE CONSTITUTIONAL ANALYSIS

The City also contends that the Street Furniture Program will not increase net signage, and therefore that it is not subject to the ban. (Opp. at 13). First, the Court notes that the Sign Ordinance does not establish a "net signage" limit within the City. Rather, it purports to ban all off-site signs throughout the City without any limitation, caveat or proviso. Moreover, the "no increase in signage" statement might mislead the casual reader because, in fact, the Street Furniture Program allows the erection of thousands of signs during the contract period while existing off-site signs are allowed to exist as legal non-conforming uses. Thus, for at least some extended period, the total signage in the City in fact increases since pre-existing signs can remain, though unmodified, repaired, or updated. This effect is rather ironic and creates constitutional problems given the fact that the City's stated purpose is to decrease visual clutter and improve traffic safety in the City.

Moreover, the City's own Opposition to Plaintiff's motion recognizes that "new [S]treet [F]urniture will be located *primarily* at existing transit stops," (*id.* (em-

phasis added)), acknowledging that new locations will be created where new signs will be erected. The City openly acknowledges that the Street Furniture Agreement sets procedures for "selecting the locations for the *new* transit shelters." (*Id.*, Oishi Decl., Ex. E [Street Furniture Agreement] at §§ 4.2–4.2.2 (emphasis added)). Thus, the Agreement does not preclude the addition of new signage and therefore may not serve to decrease visual clutter, increase aesthetic appeal, or in any way improve traffic safety.

Moreover, like the "pre-existing program" argument described above, the City makes little effort to demonstrate that this "net signage" argument addresses either the elements of *Central Hudson* or the anomaly of enacting a ban on off-site signs while operating a program that permits them. Accordingly, the Court concludes that these arguments must rise or fall under a rigorous application of the *Central Hudson* test. The Court therefore turns to that case and its progeny to determine whether the City's off-site sign ban set

forth in its Sign Ordinance passes constitutional muster.

## D. THE BAN'S CONSTITUTIONALITY UNDER CENTRAL HUDSON

Plaintiff claims that the City's off-site sign ban fails the third prong of *Central Hudson* because the broad exception under the Street Furniture Program renders the ban so underinclusive that the restriction on speech does not *directly advance* the City's interests. (Mot. at 12, 15). The City responds that even if it were appropriate to characterize the Street Furniture Program as an exception to the ban, the ban still sufficiently furthers aesthetics and traffic safety such that the third prong of *Central Hudson* is satisfied. (Opp. at 16). For the detailed reasons set forth herein, the Court disagrees.

### 1. THE CENTRAL HUDSON TEST [7]

Though entitled to some First Amendment protection, commercial speech is afforded less protection than other forms of expression. *Central Hudson*, 447 U.S. at 562–63, 100 S.Ct. 2343; *Va. State*

---

7. The City does not contest Plaintiff's contention that "[t]he contract between the City and Viacom gives the City the ability to control certain aspects of the content of the signs." (SGI ¶ 19; Oishi Decl., Ex. E [Coordinated Street Furniture Agreement] at § 4.3.7(a)). Moreover, the Sign Ordinance itself bans only "off-site" signs, not "on-site" signs. (RFJN, Ex. A [L.A.M.C. Sign Ordinance] § 91.6205.11). The on-site/off-site distinction in this case is inherently based on content. (*Id.* § 91.6203 (defining off-site signs on the basis of the message they carry)). Just as in *Metromedia, Inc. v. City of San Diego* ("*Metromedia*"). "[t]o determine if any billboard is prohibited by the ordinance, one must determine ... what message it carries." 453 U.S. 490, 503, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). Only commercial messages not pertaining to the business where the sign is located are prohibited. The City has "chosen to favor certain kinds of messages—such as on-site [ ] advertising ... over others." *Id.* at

519, 101 S.Ct. 2882. Importantly, these findings have little effect on the Court's analysis since restrictions on commercial speech must be analyzed under *Central Hudson* unless and until the Supreme Court holds otherwise. *See Valley Broad. Co. v. United States,* 107 F.3d 1328, 1331 (9th Cir.1997) ("[T]he Supreme Court has continued to apply *Central Hudson* in the commercial speech context."); *see also Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); *Metromedia,* 453 U.S. at 507, 101 S.Ct. 2882 ("We [ ] adopted a four-part test for determining the validity of government restrictions on commercial speech" and "Appellants agree that [the *Central Hudson* test is] the proper approach."). For this reason, the Court sees no need to address Plaintiff's alternative, non *Central Hudson* argument that the Sign Ordinance otherwise constitutes an impermissible content-based restriction on speech since the proper test in this case is *Central Hudson,* and the Sign Ordinance fails under that analysis.

*Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (speech motivated by a purely economic interest is not disqualified from protection under the First Amendment). The Supreme Court has reiterated and reaffirmed that the *Central Hudson* test is appropriately employed in determining "whether a particular commercial speech regulation is constitutionally permissible." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002). The protection for a particular commercial expression turns on the nature of the expression and the governmental interests served by its regulation. *Central Hudson*, 447 U.S. at 562–63, 100 S.Ct. 2343. Under *Central Hudson*, a governmental restriction on commercial speech is protected by the First Amendment if the speech: (1) concerns lawful activity and is not misleading; (2) seeks to implement a substantial governmental interest; (3) directly advances that interest; and (4) reaches no further than necessary to accomplish the objective. *Id.* at 562–66, 100 S.Ct. 2343. The Supreme Court has held that traffic safety and a city's aesthetics are substantial governmental interests. *Metromedia*, 453 U.S. at 507–08, 101 S.Ct. 2882.

 With regard to the third prong, that the regulation directly advance the government's interests, the Supreme Court has noted that "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Greater New Orleans Broad. Ass'n*, 527 U.S. at 188, 119 S.Ct. 1923 (citation omitted). Therefore, " 'the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.' " *Id.* (quoting *Central Hudson*, 447 U.S. at 564, 100 S.Ct. 2343).

 The fourth prong of the test complements the direct-advancement inquiry of the third prong, asking whether the speech restriction is more extensive than necessary to serve the interests that support it. *Id.* This element of the *Central Hudson* test does not require that the City adopt the least restrictive means for achieving its objectives. *Bd. of Trs. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Outdoor Sys. Inc. v. City of Mesa*, 997 F.2d 604, 610 (9th Cir. 1993). Rather, *Central Hudson* requires only a "reasonable fit" between the government's ends and the means chosen to accomplish those ends. *Fox*, 492 U.S. at 480, 109 S.Ct. 3028; *Greater New Orleans Broad. Ass'n*, 527 U.S. at 188, 119 S.Ct. 1923 (requiring "a fit that is not necessarily perfect, but reasonable"). Thus, as long as the means are narrowly tailored to achieve the desired objective, the structure of the regulation should be left to the judgment and discretion of governmental decision-makers. *Id.; Outdoor Sys. Inc.,* 997 F.2d at 610.[8]

---

**8.** *But see Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (involving a challenge to a provision of the Federal Alcohol Administration Act which prevented beer labels from displaying the beer's alcohol content where the Court seemed to apply a "least restrictive alternative" analysis); *see also* Erwin Chemerinsky, *Constitutional Law: Principles & Policies* § 11.3.7.3, at 1051 (2d ed. 2002) ("Cheme-

rinsky, *Constitutional Law* "). Nonetheless, more recently the Court reaffirmed *Fox* 's rejection of the least restrictive means requirement, which reinforces the conclusion that it is not a requirement of the *Central Hudson* test. *See Greater New Orleans Broad. Ass'n,* 527 U.S. at 188, 119 S.Ct. 1923 ("The Government is not required to employ the least restrictive means conceivable.").

■ The government has the burden of proving that the *Central Hudson* test is satisfied in order to justify a restriction on commercial speech, as the Supreme Courts has repeatedly held that "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 71 n. 20, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Edenfield v. Fane*, 507 U.S. 761, 770, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).

## 2. DISCUSSION

■ The first and second elements of the *Central Hudson* test are easily satisfied in this case. Advertising is indisputably a lawful activity and there has been no allegation that any of Plaintiff's advertisements are misleading. Likewise, the regulation here purports to advance the substantial governmental interests of promoting public safety and welfare by ensuring that the signs do not interfere with traffic safety and by reducing visual clutter by requiring a degree of compatibility between the signs and their surroundings. (RFJN, Ex. A [L.A.M.C. Sign Ordinance] at § 91.6201.2). First Amendment jurisprudence in the area of commercial speech teaches that a local government's interest in aesthetics and traffic safety are substantial and will, so long as the other elements of the test are satisfied, justify limitations on commercial speech. *See Metromedia*, 453 U.S. at 507–08, 101 S.Ct. 2882 (goals advanced by the city to justify the billboard restriction—traffic safety and aesthetics—were "substantial governmental goals"); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 806–07, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (city's interest in reducing visual clutter sufficient to justify a prohibition on billboards); *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 248 (9th Cir.1988) ("The City may prohibit billboards entirely in the interest of traffic safety and aesthet-

ics."). Therefore, the first and second prongs of *Central Hudson* are satisfied.

The third and fourth prongs require that the means employed by the regulation directly advance the substantial governmental interest in a way that is narrowly tailored to serve those interests. The Court concludes that the City's approach to limiting the proliferation of commercial signs within its limits fails to overcome these two hurdles.

### a. Directly Advancing a Substantial Government Interest—Traffic Safety

■ The Sign Ordinance, on its face, sets forth a limitation that, standing alone, would meet the *Central Hudson* requirements. On the one hand, the ordinance permits private property owners to erect signs, within size limitations established by the City, that advertise products offered for sale on the premises and to erect signs that display non-commercial messages. On the other hand, it prevents anyone from erecting a sign that displays a commercial message for goods or services that are not offered for sale on the premises. Such limitations have been expressly upheld in prior cases as a means of promoting traffic safety. *Metromedia*, 453 U.S. at 507–08, 101 S.Ct. 2882. But the Sign Ordinance does not stand alone.

At the same time that the City, through its Sign Ordinance, bans the erection of all new off-site signs, the City's Street Furniture Program gives the City's contractor an exclusive right to place thousands of off-site signs next to traffic lanes in every area of the City where a transit shelter, kiosk or "amenity" is located. This dichotomy undermines the Sign Ordinance's stated interests since many of the Street Furniture advertisements, which are placed at street level, are designed precisely to attract the attention of all who pass by, including those driving automobiles whose

focus would be better directed toward the operation of their vehicles. For this reason, the Street Furniture Program cannot be squared with the Sign Ordinance's stated purpose of promoting traffic safety. Given that Plaintiff's off-site signs are the same size as the advertising signs that the City allows on its Street Furniture, (SGI ¶ 16), and that Plaintiff's signs are set back away from the traffic lanes of the street, (id. ¶ 17; Fisher Decl., Ex. A [Photographs of a Kiosk Sign]; Rush Decl., Exs. C & D [Photographs of off-site signs on a bus shelter]), the Court is hard pressed to see how the City can reconcile the impact of the Street Furniture Program with the Sign Ordinance's stated objective of promoting traffic safety.

Plaintiff presents evidence from a traffic engineer with 30 years of experience who conducted a survey and concluded that the City's off-site sign depicted in a photograph posed a potentially **greater traffic hazard** than the Metro Lights sign. (Kunzman Deck ¶ 14; Mot. at 10). However, this evidence is not necessary to the Court's ruling since the study tends to confirm that which common sense suggests.[9] If a sign is in the field of vision of a driver, which is indisputably the case with the Street Furniture signs, it will have the potential of distracting the driver from his or her primary task of safely operating the vehicle. The Court considers the precise location of the sign in the field of vision to be immaterial to the First Amendment analysis in this case. While experts might argue over the degree of distraction created by signs that are 30 degrees off a driver's visual axis as opposed to those 45 degrees off axis, there can be little dispute that advertising materials at or near the public right of way seek the attention of the driver and create some identifiable, if not measurable, level of distraction. No persuasive argument can be made that off-site signs, which the Sign Ordinance suggests are a traffic safety hazard, are measurably less dangerous by virtue of being placed adjacent to the public rights of way as opposed to being further off the visual axis.

*Greater New Orleans Broad. Ass'n* speaks directly to the issue now before this Court. 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161. In that case, the FCC had issued regulations banning the advertisement of privately operated commercial casino gambling. The FCC applied the ban to several New Orleans area licensed broadcasters, who contended that they should be permitted to sell and broadcast advertisements for legal casino gambling in Louisiana. The FCC refused to allow this broadcasting on the ground that the broadcast signals could, under certain circumstances, reach into Texas and Arkansas where private casino gambling was prohibited. The District Court sided with the government and held, under *Central Hudson,* that the ban directly advanced a substantial governmental interest through a means that was no more extensive than necessary to achieve its purposes. *Greater*

---

**9.** As noted in the Statement of Facts above, the City attempted to undermine Plaintiff's expert with a declaration from the Contract Administrator of the Street Furniture Program. Notably, that declaration asserted only that the new advertising panels *"may* not cause any more traffic and safety impacts than the advertising on the old [S]treet [F]urniture." (Oishi Decl. ¶¶ 2, 24 (emphasis added)). That statement provides no help to the City, and indeed lends support to Plaintiff's argument. When the old Street Furniture was constructed and installed, the Sign Ordinance which is at the center of this case had not been adopted, so no First Amendment issue was implicated at that time. On the other hand, the declaration amounts to a concession that signs on Street Furniture affect traffic safety, thus implicitly conceding that Street Furniture signs tend to undermine the principal objective of the Sign Ordinance.

*New Orleans Broad. Ass'n*, 527 U.S. at 181, 119 S.Ct. 1923. The Fifth Circuit affirmed.

The Supreme Court disagreed and reversed the lower court decisions holding that the FCC regulations, as applied in that case, violated *Central Hudson.* As in this case, the Supreme Court found that the ban satisfied the first two elements of the test, but failed to "directly advance" the identified governmental interests in alleviating the deleterious effects of gambling. The Court noted, as a principal basis for its decision, the inconsistencies in governmental policies relevant to gambling:

> While it is no doubt fair to assume that more advertising would have some impact on overall demand for gambling, it is also reasonable to assume that much of that advertising would merely channel gamblers to one casino rather than another. *More important, any measure of the effectiveness of the Government's attempt to minimize the social costs of gambling cannot ignore Congress' simultaneous encouragement of tribal casino gambling, which may well be growing at a rate exceeding any increase in gambling or compulsive gambling that private casino advertising could produce.*

*Greater New Orleans Broad. Ass'n*, 527 U.S. at 189, 119 S.Ct. 1923 (emphasis added). Accordingly, the Court observed:

> We need not resolve the question whether any lack of evidence in the record fails to satisfy the standard of proof under *Central Hudson*, however, because the flaw in the Government's case is more fundamental: The operation of [18 U.S.C.] § 1304 and its attendant regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it.

*Id.* at 190, 119 S.Ct. 1923. In the end, therefore, the Court concluded that "there was 'little chance' that the speech restriction could have directly and materially advanced its aim, while other provisions of the same Act directly undermined and counteracted its effects." *Id.* at 193, 119 S.Ct. 1923 (citation omitted).

The City's adoption of the Sign Ordinance after establishing the Street Furniture Program through its contract with Viacom creates a similar situation here. The City, on the one hand, enacted the Sign Ordinance for the express purpose of promoting traffic safety and eliminating visual clutter, while, on the other hand, awarding a large contract that permits its contractor to do precisely what its Ordinance prohibits. In short, the two operate at cross purposes. On this point, the Supreme Court has held that:

> There can be no question that a prohibition on the erection of billboards infringes freedom of speech: The exceptions do not create the infringement, rather the general prohibition does. But *the exceptions to the general prohibition are of great significance in assessing the strength of the city's interest in prohibiting billboards.*

*Metromedia*, 453 U.S. at 520, 101 S.Ct. 2882 (emphasis added). Under such circumstances, the Supreme Court, applying the *Central Hudson* test, barred the enforcement of the FCC advertisement ban precisely because it was in conflict with other governmental policies. *See Greater New Orleans Broad. Ass'n*, 527 U.S. at 189–90, 193, 119 S.Ct. 1923.

Although the relevant First Amendment jurisprudence seems quite clear, the City seeks to divert attention from its difficulties under *Central Hudson* with a factual and a legal argument, neither of which warrant lengthy discussion. From a factual standpoint, the City asserts that buses operated by the Metropolitan Transit Authority display advertisements that closely

resemble those found on Street Furniture and that those signs can be equally, if not more, distracting than the signs found on Street Furniture. (SGI ¶ 42). Even if true, the City's argument misses the mark. The issue before this Court is not whether other forms of signage or advertising pose a danger to traffic safety, but whether the Sign Ordinance directly advances the goal of enhanced traffic safety while permitting the same advertisements through the Street Furniture Program. The fact that other forms of advertisement may also undermine traffic safety will not save the Sign Ordinance under the *Central Hudson* test.

As legal support for its position, the City suggests that *MBC Realty, LLC v. Mayor & City Council of Baltimore*, 351 F.Supp.2d 420 (D.Md.2005) ("*MBC Realty*"), an out-of-circuit district court decision, supports its defense of the Sign Ordinance. Even if *MBC Realty* had been decided in the Ninth Circuit, it would be of no help to the City in this case. In *MBC Realty*, a group of downtown Baltimore commercial property owners filed an equal protection challenge and state-law claims against certain local ordinances that outlawed new billboards everywhere in the city, while granting authority for the erection of billboards on a city-owned sports arena in a downtown business district. The court held that Baltimore's exception did not violate the Equal Protection Clause since the city council's actions were not irrational. Specifically, the court concluded that "the exception to the city-wide billboard moratorium which permits the installation of billboards on the arena in the downtown business district is rationally related to the overarching concern for the general health and welfare which animated the imposition of the moratorium on billboards in the first place." *Id.* at 425.

This brief discussion demonstrates that *MBC Realty* addressed different legal questions in a radically different context. First, that case addressed an equal protection question raised by a plaintiff who did not even allege a First Amendment violation. The court expressly noted that the plaintiffs "[did] not remotely suggest that they have asserted a First Amendment or other fundamental right in this case[,] and they explicitly concede that 'rational basis' is the appropriate standard of review." *Id.* Second, *MBC Realty* involved a city-wide ban on billboards, with only a single exemption for the placement of signs at a city-owned sports arena. The ban in the instant case is much broader, allowing Viacom to place signs virtually anywhere Street Furniture exists or is later constructed. Third, in *MBC Realty* the ordinance at issue required that "all bills seeking approval of such a conditional use had to be accompanied by a plan for the removal of at least one existing general advertising sign for each proposed sign." *Id.* at 423. Thus, there was no net increase in signage, the real possibility of which exists here.

Despite these obvious differences in the issues addressed in *MBC Realty*, the City contends that the Court should infer from the ruling on the equal protection issue that the court must have found that the city-wide ban still furthered the goals of aesthetics and traffic safety. The Court finds no logical basis for making such a leap. To find that the equal protection rational basis test was satisfied, the court needed only to find some conceivable, rational purpose for the ban and the exception, which could have been something other than traffic safety or aesthetics. Given the difference in the equal protection and First Amendment jurisprudence, nothing in the case would support any implicit conclusion regarding either aesthetics or traffic safety. Thus, even if the Court were bound to follow this decision, it would limit its consideration of the case to the

text of the memorandum and not to what the court failed to say but "must have" meant.

In short, having reviewed the record, the undisputed facts and the parties' authorities, the Court concludes that the record falls short of establishing, as a matter of law, that the Sign Ordinance directly advances the City's substantial interest in traffic safety. On the contrary, given the lack of any real dispute regarding the material facts in the case, the Court concludes that the Sign Ordinance, viewed in context of the City's Street Furniture Program, does not directly advance the City's stated interest in traffic safety. *See 44 Liquormart v. R.I.*, 517 U.S. 484, 505, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) ("[A] commercial speech regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.") (citation and quotation marks omitted). The City cannot, on the one hand, preclude Plaintiff from displaying messages on its off-site signs as a supposed legitimate exercise of its police powers while, on the other hand, authorizing its Street Furniture contractor to erect off-site signs in or near the public rights of way throughout the City of Los Angeles. Thus, the Court concludes that "[traffic] safety is a stated but unfounded goal and does not support the differential treatment" in a manner consistent with our Constitution. *See Sandhills Ass'n of Realtors v. Village of Pinehurst*, No. CV–98–303 (RAEx), 1999 U.S. Dist. LEXIS 19094, at *28 (M.D.N.C. Nov. 8, 1999).

### b. Directly Advancing a Substantial Government Interest Aesthetics

■ The City also suggests that the Sign Ordinance furthers the City's interest in aesthetics and that the Sign Ordinance passes constitutional muster on this ground.[10]

While the Court agrees that the Sign Ordinance and the Street Furniture Program superficially appear compatible on the issue of aesthetics,[11] a closer analysis

---

**10.** As an initial matter, contrary to the City's argument in its cross-motion, it is unclear whether aesthetics *alone* is a sufficiently substantial justification for a restriction on commercial speech. While the City relies on *Metromedia* for support, there the plurality simply held that aesthetics *and* traffic safety together were substantial government interests. 453 U.S. at 507–08, 101 S.Ct. 2882. Indeed, most courts address these interests in tandem, and most regulations that rely on these purposes cite both as their important governmental interest, such that they are deemed substantial together, not individually. *See, e.g., Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1269 (11th Cir.2005) ("[T]he stated legislative purpose [(not purposes)] of improving traffic safety and aesthetics."). Some cases have dealt with the issue, but it has not been squarely addressed in the context of *Central Hudson*. For example, then Associate Justice Rehnquist expressed the view that aesthetic justification alone is sufficient to sustain a total prohibition of billboards within a community. *Metromedia*, 453 U.S. at 570, 101 S.Ct. 2882 (Rehnquist, J., dissenting). In fact, in the closest case on point since then, the Supreme Court held that "[i]t is well settled that the state may legitimately exercise its police powers to advance esthetic values," but there the Court did not engage in a *Central Hudson* analysis. *Taxpayers for Vincent*, 466 U.S. at 805, 104 S.Ct. 2118. Thus, the issue seems to remain open, but it is an issue this Court need not decide since even if aesthetics alone is a substantial interest for purposes of *Central Hudson*, the Sign Ordinance nonetheless fails the third and fourth prongs of the test.

**11.** For example, the Street Furniture Program provides for the installation and maintenance of public restrooms, kiosks, news racks and transit shelters. Old dilapidated furniture would be replaced; newly constructed furniture would be designed to be aesthetically pleasing and to harmonize with the surrounding neighborhood. In these ways, the Street Furniture Program enhanced aesthetics but by focusing more on what might be described as architectural issues as opposed

reveals that the Ordinance still does not meet the *Central Hudson* test for the same reasons discussed above. The Sign Ordinance purports to protect the visual environment by eliminating all off-site signs from the City's public rights of way, while the Street Furniture Program simultaneously authorizes thousands of such signs to be posted throughout the City by Viacom. Plaintiff presents graphic evidence of this point in a photograph which compares a Metro Lights sign with a City bus shelter sign with exactly the same dimensions and the same advertising copy. (Kunzman Decl., Ex. D [Photographs] at 3(a), (b)). Though the signs themselves are indistinguishable, one sign falls within the ban while the other does not. In short, what the City, through its Sign Ordinance, takes away from most commercial enterprises (for the stated purpose of protecting the visual environment), the City grants back to a single advertiser under the Street Furniture Program thereby perpetuating, rather than eliminating, off-site signage throughout the City. Had the City implemented a blanket ban on all off-site signs without the exception for Viacom, Plaintiff admitted at oral argument that such a regulation would be constitutional. However, Plaintiff argues, and the Court agrees, that the facts of this case are materially different.

Again, as in *Greater New Orleans Broad. Ass'n*, the City cannot persuasively argue that its Ordinance complies with *Central Hudson* by directly advancing a substantial governmental interest while the City promulgates other policies that undermine the stated interest. In fact, the immediate effect of the ordinance would likely be to increase net signage since, as noted, the ordinance turns pre-existing

signs into legal non-conforming uses not capable of being updated, altered or modified. That these signs can continue to exist without modification or alteration cuts against the City's stated goal of improved aesthetics since the signs are permitted to physically deteriorate without any limitation. This failure to directly advance these interests also relates to the narrowly tailored requirement as discussed *infra*. Thus, the Court concludes that the undisputed facts set forth in the record before this Court establish that the Sign Ordinance, viewed in context of the City's Street Furniture Program, does not directly advance the City's stated interest in protecting the City's visual environment.

### c. Narrowly Tailored

As stated, the fourth prong of the *Central Hudson* test complements the direct advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it. *Greater New Orleans Broad. Ass'n*, 527 U.S. at 188, 119 S.Ct. 1923. The law only requires that the regulation be narrowly tailored to advance the governmental interests; the regulation does not need to be the least restrictive alternative. Nevertheless, as *Central Hudson* observed, "[t]he regulatory technique may extend only as far as the interest it serves. The State cannot regulate speech that poses no danger to the asserted State interest, nor can it completely suppress information when narrower restrictions on expression would serve its interest as well." 447 U.S. at 565, 100 S.Ct. 2343 (citations omitted). Thus, in that case the Court held that a complete ban on advertising by a regulated utility was far broader than necessary to promote

to matters of communication. While the elimination of old, unsightly benches and kiosks and replacing them with new, architecturally harmonious transit shelters and relat-

ed structures is a laudable goal, it bears only a tangential relationship to the issue of the impact of commercial signage on the visual environment.

equity and efficiency in the establishment of utility rates.

In *Greater New Orleans Broad. Ass'n*, the Supreme Court noted that the fourth prong "complements the direct-advancement inquiry of the third." 527 U.S. at 188, 119 S.Ct. 1923. In assessing whether the FCC ban on gambling advertisements satisfied the narrow tailoring requirement, the Court wrote:

> More important, any measure of the effectiveness of the Government's attempt to minimize the social costs of gambling cannot ignore Congress' simultaneous encouragement of tribal casino gambling, which may well be growing at a rate exceeding any increase in gambling or compulsive gambling that private casino advertising could produce.

*Id.* Indicating that these conflicting policies rendered the FCC's advertising ban unconstitutional under the *Central Hudson* test, and further relying on its precedent in *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995), the Court concluded:

> There, we considered the effect of conflicting federal policies on the Government's claim that a speech restriction materially advanced its interest in preventing so-called 'strength wars' among competing sellers of certain alcoholic beverages. We concluded that the effect of the challenged restriction on commercial speech had to be evaluated in the context of the entire regulatory scheme, rather than in isolation, and we invalidated the restriction based on the 'overall irrationality of the Government's regulatory scheme.' As in this case, there was 'little chance' that the speech restriction could have directly and materially advanced its aim, 'while other provisions of the same Act directly undermined and counteracted its effects.' Coupled with the availability of other regulatory options which could advance the asserted interests 'in a manner less intrusive to [petitioners'] First Amendment rights,' we found that the Government could not satisfy the *Central Hudson* test.

527 U.S. at 192–93, 119 S.Ct. 1923 (internal citations omitted) (brackets in original).

The same can be said here, even though the inconsistency and the reasons for its existence are less subtle than those discussed in *Greater New Orleans Broad. Ass'n*. Here the City has placed a blanket ban on the construction and display of off-site signs throughout the City. The law is clear and unequivocal: no one, at no time, may display such signs. When that unambiguous language was written into law, the City had already entered into an agreement with a private company that expressly permitted that company to do what the Ordinance prohibited. The effect of the Ordinance was to grant to one advertising contractor the sole and exclusive right to display advertising on off-site signs throughout the City. And while the Street Furniture Agreement focuses on transit stops and shelters, it is not limited to those locations. For example, Viacom is permitted to display off-site signs in kiosks installed within a foot of the curb line on street corners where no bus stop is located. (Fisher Decl., Ex. B [Photograph of Advertising Copy]). The City cannot persuasively argue that the stated goals of the Sign Ordinance are furthered when its contractor is permitted to install distracting advertising kiosks within a foot of traffic lanes.

The City relies heavily on *Metromedia* in support of its argument that the Sign Ordinance is not fatally underinclusive despite the exclusion of the Street Furniture Program from the off-site sign ban. 453 U.S. at 511–12, 101 S.Ct. 2882. However, *Metromedia* is distinguishable. In *Metromedia*, the ordinance under scrutiny

drew a distinction between off-site and on-site signs *only,* which is the same distinction drawn by the Sign Ordinance at issue here. The Court therefore addressed the question of whether excluding on-site signs from the ordinance undermined its purposes and rendered it so underinclusive that it failed the *Central Hudson* test. The Supreme Court noted that the distinction recognized in the San Diego ordinance had been considered and approved in numerous decisions. *Id.* at 511, 101 S.Ct. 2882. Moreover, the Supreme Court held that the City could have a number of good reasons for favoring one classification of signs—those defined as "on-site" signs—over those that fell within the definition of off-site. *Id.* at 511–12, 101 S.Ct. 2882.

The situation presented in this case is quite different. The City purports to ban all off-site signs on private property through the Sign Ordinance. But through the Street Furniture Program, the City not only permits but appears to encourage their display on public property throughout Los Angeles. This goes well beyond the scheme addressed in *Metromedia*. The Ordinance and the Street Furniture Program confer on one private contractor a right to do what the City claims all others are prohibited from doing. Thus, unlike the ordinance in *Metromedia* which brought about a complete ban on off-site signs, here the City's Sign Ordinance purports to, but does not, accomplish a complete ban and is instead pierced with a colossal exception. *Metromedia* therefore provides no support for the City's position in this case.

The Court agrees with the Sixth Circuit's reasoning in *Discovery Network, Inc. v. Cincinnati,* 946 F.2d 464 (6th Cir.1991). There, the court noted:

> The ordinance is not narrowly tailored because there are many options available to the city that would address its aesthetic, safety, and proliferation concerns without placing the significant

burden on commercial speech that the ordinance does. None of these options would be less effective in promoting the asserted interests than is the complete ban on distribution of commercial handbills.

*Id.* at 473 (citation omitted). Here, there are also many alternatives. Most obviously, the City could impose the same requirements on other private advertisers as it did on Viacom. That is, the City could require that any advertisements meet certain specifications—including size and location—to promote the City's goals with regard to traffic safety and aesthetics. Such universal restrictions could apply to *all* advertisers instead of banning the speech of all but one City-chosen advertising contractor.

For these reasons, the Court concludes, on the specific facts of this case, that the Sign Ordinance is more extensive than necessary to serve the interests that support it and fails to satisfy the fourth prong of *Central Hudson.*

### 3. CONCLUSION REGARDING *CENTRAL HUDSON* ANALYSIS

For the foregoing reasons, the Court concludes that the Sign Ordinance violates the First Amendment to the United States Constitution and is unconstitutional as applied in this case. The Sign Ordinance fails both the third and fourth prongs of *Central Hudson* since together the Sign Ordinance and accompanying exception do not, in a narrowly tailored manner, directly advance the City's interests in traffic safety and aesthetics. Therefore, Plaintiff's motion for summary adjudication on the First Amendment issue is **GRANTED.**

### E. EQUAL PROTECTION [12]

#### 1. LEGAL STANDARD

The Equal Protection Clause is implicated when the government draws a classifi-

---

**12.** While Plaintiff does not move for summary adjudication on the equal protection issue, the

cation or distinction between two groups, treating each one differently. Once a classification is deemed to exist, the Court must identify the level of scrutiny to be applied, which will depend on the type of discrimination alleged. *See generally* Chemerinksy, *Constitutional Law* § 9.1.2, at 643–50. Rational basis scrutiny is applied when the discrimination is not based on a suspect classification such as race, national origin, or gender. *Id.* Under this standard, a law will be upheld if it is rationally related to some conceivable, legitimate government purpose. *Id.; see, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 14, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). Thus, the means chosen to accomplish the end must only be rationally related to a conceivable government purpose.

### 2. ANALYSIS

■ Rational basis review is the proper standard to apply since there is no suspect or quasi-suspect class involved in this case. Indeed, at oral argument Plaintiff admitted there existed no suspect classification for purposes of the equal protection analysis. The City argues that its regulatory scheme does not violate equal protection because it survives rational basis review, since the Street Furniture Program provides attractive new Street Furniture that both improves aesthetics and provides a more comfortable wait for transit patrons. (Opp. at 18). The Court agrees.

The Sign Ordinance, at least to some degree, is rationally related to the interests of traffic safety and aesthetics because it attempts to prevent new off-site signs (other than new Street Furniture) and decrease visual clutter. For example,

the Street Furniture Program, at least in part, replaces aging and dilapidated bus benches and other Street Furniture. (Oishi Decl., Ex. E [Agreement for Coordinated Street Furniture] § 4.3.4). Such replacements are at least rationally related to the goals of aesthetics and improving traffic safety.

Furthermore, over time old signs will be eliminated since they cannot be updated or modified, and this may result in a net decrease in signage, at least in the long run.

Given this evidence and the evidence presented *supra*, the City has a legitimate purpose for the ban: the goals of increasing traffic safety and improving City aesthetics certainly satisfy the requirements of rational basis review. *See Metromedia*, 453 U.S. at 507–08, 101 S.Ct. 2882 (goals advanced by the city to justify the billboard restriction—traffic safety and aesthetics—were "substantial governmental goals").

There exists a critical distinction that allows for the same interests—traffic safety and aesthetics—to support the conclusion that the equal protection claim fails, even though they cannot adequately support the City's argument on the First Amendment issue. On Plaintiff's First Amendment claim, *Central Hudson* requires that the regulation directly advance a substantial government interest in a narrowly tailored fashion. Equal protection jurisprudence involving a non-suspect classification, on the other hand, requires that the law be upheld unless the challenging party can show it is not rationally related to a conceivable government purpose. Under equal protection jurisprudence, there

City examines it in its Opposition and also moves for summary adjudication on the claim

in its cross-motion for summary judgment. Thus, the Court must decide the issue here.

is no requirement that the regulation be the least restrictive alternative or even narrowly tailored. Rather, the regulation must simply be rationally related to some conceivable and legitimate governmental purpose. *See U.S. R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) ("Where ... there are plausible reasons for [the government's] action, our inquiry is at an end."); *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (a regulation "will not be set aside if any state of facts reasonably may be conceived to justify it"). Therefore, the Court agrees with the City that there is at least some conceivable legitimate purpose for the City's ban and accompanying Street Furniture Program that is rationally related to that purpose, such as the promotion of aesthetics and traffic safety. Thus, the ban does not violate their Equal Protection Clause and, for that reason, the City's cross-motion for summary judgment on this claim is **GRANTED** and judgment on this claim should be entered in favor of the City.

## F. CITY'S SOVEREIGN POWER TO REGULATE ITS OWN PROPERTY AND PRIVATE PROPERTY

The City claims that it can constitutionally place signs on its own property and still regulate signs on private property in any manner it sees fit, so long as there is a reasonable basis for doing so. (Opp. at 19). It asserts that its ban on off-site signs, applicable only to private property, is a valid exercise of its police power.

The City has presented no authority for the proposition that *Central Hudson* does not apply in the present circumstances and has in fact agreed to its application, (10/31/05 Tr. [Summary Adjudication Hearing] at 21:20–22 ("I agree with the Court that when the dust settles on this case it really does always come back to *Central Hudson*.")), or that the exercise of the City's police powers in some way supercedes the First Amendment's protections.[13] Instead, in a last ditch effort to save the Sign Ordinance, the City proffers a "parade of horribles" that granting Plaintiff's motion would have "disastrous

13. *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) and *Children of the Rosary v. City of Phoenix,* 154 F.3d 972 (9th Cir.1998), on which the City relies, provide no support for its position. In *Lehman,* the Court dealt with limitations on political messages, but not commercial advertisements on buses. The Court was asked to decide whether advertising space on the bus constituted a public forum under First Amendment jurisprudence, and held that it was not. The Court therefore concluded that the City could preclude political advertising in that location. The Court concluded:

> No First Amendment forum is here to be found. The city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience.

418 U.S. at 304, 94 S.Ct. 2714. In *Children of the Rosary,* this Circuit likewise addressed an advertising law limiting advertising on bus panels to commercial speech. The Circuit affirmed the district court's denial of appellant's motion for a preliminary injunction seeking to advertise the sale of an anti-abortion bumper sticker. The Circuit relied on the fact that bus panels were nonpublic fora and proceeded with that analysis to conclude that there existed no improper viewpoint regulation. 154 F.3d at 982. Here, advertising on bus panels is not at issue. Neither are political or religious advertisements, as was the case there and on which the court seemed to rely. *Id.* Unlike the cited cases, the Sign Ordinance at issue here purports to ban commercial speech, but the ban applies to everyone except a City-chosen contractor, Viacom, which is excepted from the ban. Thus, both cases are distinguishable and no party has argued that the public/nonpublic forum analysis should apply, as the Sign Ordinance and accompanying exception encompass advertising copy located on the public sidewalks *and* on private property.

nationwide repercussions." (Opp. at 21). The Court rejects the City's plea since the City obviously fails to appreciate the foundation for this Court's ruling, which distinguishes this case from different otherwise similar billboard cases. That is, the City's Sign Ordinance is coupled with a gaping exception for the City's private contractor, thereby eviscerating any chance that the Sign Ordinance can satisfy the constitutional requirements of *Central Hudson*. Since the Court concludes that the Sign Ordinance violates *Central Hudson*, for the reasons discussed *supra*, the Court rejects the City's policy argument.

## IV.

### CONCLUSION

Plaintiff's motion for summary adjudication on the First Amendment issue is **GRANTED** since the City's Sign Ordinance fails the *Central Hudson* test. The City's cross-motion for summary judgment on the First Amendment issue is **DENIED,** while its motion on Plaintiff's equal protection claim is **GRANTED.**

IT IS SO ORDERED.