**WORLD WIDE RUSH, LLC, a Pennsylvania corporation, and Insite Outdoor Works LA, LLC, a Delaware limited liability company, Plaintiffs,**

v.

**CITY OF LOS ANGELES, a California municipal corporation and Doe 1 through Doe 10, inclusive, Defendant.**

Case No. CV 07–238 ABC (JWJx).

United States District Court,
C.D. California.

June 9, 2008.

Michael C. Small, Rex S. Heinke, Akin Gump Strauss Hauer & Feld, Los Angeles, CA, Paul E. Fisher, Law Ofc. Paul E. Fisher, Santa Ana, CA, for Plaintiffs.

Kenneth T. Fong, Rockard J. Delgadillo, Los Angeles City Attorney's Office, Michael J. Bostrom, Deputy City Attorney, Los Angeles, CA, for Defendant.

**ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DEFENDANT'S MOTION TO DISMISS**

AUDREY B. COLLINS, District Judge.

Pending before the Court is Plaintiffs World Wide Rush, LLC and Insite Outdoor Works LA, LLC's ("Plaintiffs' ") Motion for Preliminary Injunction, filed on May 5, 2008. Defendant City of Los Angeles (the "City") opposed on May 19, 2008 and Plaintiffs replied on May 23, 2008. Also pending before the Court is the City's Motion to Dismiss, filed on April 21, 2008. Plaintiffs opposed on May 5, 2008 and the City replied on May 19, 2008. The Court also ordered the parties to file simultaneous supplemental briefs on May 30, 2008, which they did. The Court heard arguments on June 9, 2008. After considering the papers, arguments, and case file in this matter, the Court GRANTS IN PART Plaintiff's Motion for Preliminary Injunction and GRANTS IN PART the City's Motion to Dismiss.

## I. FACTUAL BACKGROUND

Plaintiffs are licensed to engage in the business of leasing outdoor advertising space for advertisers to erect signs in the City of Los Angeles. Plaintiffs lease 34 sign sites within the City and the signs do not typically advertise goods or services available on the premises where they are located. Some of these signs are located within 2,000 feet of a freeway.

The City regulates outdoor signs through its "sign ordinance," Section 14 of Article 4.4 of the Los Angeles Municipal Code ("LAMC"). The sign ordinance defines "off-site" signs as:

A sign that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located.

Section 14.4.2 (also defining "on-site" signs as "[a] sign that is other than an off-site sign."). A "supergraphic sign" is:

A sign, consisting of any image projected onto a wall or printed on vinyl, mesh, or other material with or without written text, supported and attached to a wall by an adhesive and/or by using standard cable and eye-bolts and/or other material or methods and which does not comply with [certain other provisions of the sign ordinance].

*Id.*

The sign ordinance imposes a blanket ban on all off-site and supergraphic signs, unless the proposed signs are "specifically permitted pursuant to a legally adopted specific plan, supplemental use district, [or] an approved development agreement." Section 14.4.4(B)(9), (11). Off-site signs are also exempt from the blanket ban if they are "specifically permitted pursuant to ... a relocation agreement entered into pursuant to California Business and Professions Code Section 5412." Section 14.4.4(B)(11).

A separate provision of the sign ordinance regulates signs with "Freeway Exposure": "No person shall erect, construct, install, paint, maintain, and no building or electrical permit shall be issued for, any sign or sign support structure within 2,000 feet of a freeway...." Section 14.4.6. This ban exempts signs that the City's "Department of Building and Safety ... determine[s] will not be viewed primarily from a main traveled roadway of a freeway or an on-ramp/off-ramp." *Id.* "Viewed primarily from" a freeway means "that the message may be seen with reasonable clarity for a greater distance by a person traveling on the main traveled roadway or freeway or on-ramp/off-ramp than by a person traveling on the street adjacent to the sign." *Id.* This provision has two exceptions:

- Signs that "identify the building where the sign is located" are exempted, so long as "the area of the sign is not more than 50 square feet or is not larger than five percent of the area of the side of the building, which faces primarily to the freeway, which ever is greater[.]"

- Wall signs are also exempted "on which the advertising is limited to the name of any person, firm, or corporation occupying the building, or the type of business, services rendered, or the name of any product manufactured or sold on the premises," so long as "[t]he total area of all wall signs on a building permitted in this subdivision shall not exceed 100 square feet [and][a]ny one sign shall not exceed 50 square feet in area."

*Id.* § 14.4.6B 1, 2. The "Freeway Exposure" provision also exempts signs that are "specifically permitted pursuant to a legally adopted specific plan, supplemental use district, [or] an approved development agreement." Section 14.4.4(B)(9), (11).

So far, the City has enforced the sign ordinance against seven of Plaintiffs' 34 sign locations. The City's Orders to Comply for these sites alleged that the signs are unpermitted "supergraphic" signs. Plaintiffs have applied for permits for these sites, which have been denied. One site at 6081 Center Drive has been subject to criminal prosecution and the City has threatened criminal prosecution for the other six sites.

This litigation has been pending since January 2007. The City moved to dismiss Plaintiffs' initial complaint and the Court partially granted that motion, allowing Plaintiffs to pursue their facial unfettered discretion and overbreadth challenges to certain aspects of the sign ordinance. The Court ruled that most of Plaintiffs' other challenges, including their as-applied challenges, failed because they did not allege that the City had taken (or was likely to take) any enforcement efforts against their

sign sites. After this ruling, Plaintiffs declined to file an amended complaint.

In January 2008, Plaintiffs moved for a preliminary injunction based upon claims that either had not survived the motion to dismiss or were never alleged in Plaintiffs' complaint to begin with. To compound Plaintiffs' problems, the deadline to amend the pleadings in the Scheduling Order had passed. The Court declined to rule on the motion for preliminary injunction, instead ordering Plaintiffs to move to amend the Scheduling Order. Plaintiffs so moved the Court, and, although the Court initially denied Plaintiffs' motion to add new claims to its complaint, the Court ultimately allowed Plaintiffs to filed an amended and supplemental complaint adding facts to allege standing and asserting new claims. The Court also reopened discovery. In lieu of filing an answer, the City filed a motion to dismiss Plaintiffs' amended complaint. Both the City's motion to dismiss and Plaintiffs' motion for preliminary injunction are now before the Court.

## II. MOTION FOR PRELIMINARY INJUNCTION

### A. Legal Standard

■ To obtain a preliminary injunction, a plaintiff must show "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id.* (internal quotations omitted). "Thus, the greater the relative hardship to [a plaintiff], the less probability of success must be shown." *Id.*; *see also International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993). A preliminary injunction is

an "extraordinary remedy" for which the need must be "clear and unequivocal." *Shelton v. National Collegiate Athletic Ass'n*, 539 F.2d 1197, 1199 (9th Cir.1976).

■ The Court may consider inadmissible evidence on a motion for preliminary injunction. *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm."); *Rosen Ent. Sys., LP v. Eiger Vision*, 343 F.Supp.2d 908, 912 (C.D.Cal.2004). "The exigencies of preliminary relief often prevent the movant from procuring supporting evidence in a form that would meet Rule 56(e)'s requirement of evidence admissible at trial." *Dr. Seuss Ents. v. Penguin Books USA, Inc.*, 924 F.Supp. 1559, 1562 (S.D.Cal.1996). "Such evidence may yet be considered by the court, which has discretion to weigh the evidence as required to reflect its reliability." *Id.*

### B. Discussion

Plaintiffs have moved to enjoin enforcement of three provisions of the sign ordinance: the exceptions to the off-site and supergraphic sign bans found in Section 14.4.4(B)(9) and 14.4.4(B)(11), and the "Freeway Exposure" provision in Section 14.4.6. Plaintiffs challenge these provisions both as giving the City unfettered discretion to restrict speech and as imposing impermissible restrictions on commercial speech in violation of *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) ("*Central Hudson*"). The Court concludes that Plaintiffs can establish a likelihood of success on their unfet-

tered discretion challenge to three of the four exceptions in section 14.4.4(B)(9) and (11) and those exceptions cannot be severed from the blanket off-site and super-graphic sign ban. Plaintiffs, however, have failed to plead a claim that these provisions also run afoul of *Central Hudson*, so the Court cannot grant a preliminary injunction on that ground. The Court also concludes that Plaintiffs cannot prevail on their unfettered discretion challenge to section 14.4.6, but they can show a likelihood of prevailing on their *Central Hudson* challenge to this provision.

### 1. Likelihood of Success on Unfettered Discretion Challenge to Section 14.4.4(B)(9) and (11)

An ordinance violates the First Amendment "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir.2006) (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002)). For this reason, "a law cannot condition the free exercise of First Amendment rights on the 'unbridled discretion' of government officials." *Desert Outdoor Advertising v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir.1996). "This requirement seeks to 'alleviate the threat of content-based, discriminatory enforcement that arises where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit.'" *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 903–04 (9th Cir.2007) (quoting *G.K. Ltd. Travel*, 436 F.3d at 1082). Therefore, a regulation must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.* at 904.

Three Ninth Circuit cases guide the Court's analysis in the specific context of billboard regulations like the sign ordi-nance at issue here. *See id.*; *Desert Outdoor*, 103 F.3d at 818–19; *G.K. Ltd. Travel*, 436 F.3d at 1082–84. First, in *Outdoor Media*, the plaintiff sought a permit under a scheme that allowed city officials to approve a permit application within 15 days if it was "in conformance with this Chapter and [ ] consistent with its intent and purpose." *Outdoor Media*, 506 F.3d at 904. The "intent and purpose" of the City's sign ordinance included "encouraging 'a desirable urban character which has a minimum of overhead clutter,' enhancing the 'economic value of the community and each area thereof through the regulation of the size, number, location, design and illumination of signs,' and encouraging 'signs which are compatible with on-site and adjacent land uses.'" *Id.* (quoting sign ordinance). The sign ordinance defined off-site signs as the City does here, and the city in that case also had a restriction on freeway-visible signage: "the planning commission could grant permits for freeway-facing signs only if the signs are 'located upon or within five hundred (500) feet of the property upon which the use identified is located' and 'in the vicinity of a freeway interchange and within three hundred (300) feet of the freeway right-of-way and six hundred (600) feet of the intersecting street right-of-way.'" *Id.* (quoting sign ordinance). Moreover, the city officials granting the permits were required to make "specific findings" regarding the "proposed height in relation to the freeway elevation, the number and spacing of signs in the area, and the sign's height, design, and location in relation to its proposed use." *Id.* Finally, the sign ordinance at issue required any signs to be " 'compatible with the style and character of existing improvements upon lots adjacent to the site,' including incorporating specific visual elements such as type of construction materials, color, or other design detail." *Id.*

The court in *Outdoor Media* concluded that these provisions provided sufficient guidance to eliminate the risk of unfettered discretion. First, the definition of "off-site" signs in the ordinance "is sufficiently clear to guide [the city official's] discretion, particularly when coupled with the additional restrictions governing freeway-facing signs." *Id.* The city official's discretion was also "cabined by specific findings regarding the relationship of the sign to the site, the freeway, and other signs in the area." *Id.* at 904–05. Notably, the court concluded that, although the "design review criteria are 'somewhat elastic and require reasonable discretion to be exercised by the permitting authority, this alone does not make the Sign Code an unconstitutional prior restraint.'" *Id.* at 905 (quoting *G.K. Ltd. Travel,* 436 F.3d at 1083).

In *Desert Outdoor,* the plaintiffs challenged a sign ordinance that conditioned a permit on a finding that it "will not have a harmful effect upon the health or welfare of the general public and will not be detrimental to the welfare of the general public and will not be detrimental to the aesthetic quality of the community or the surrounding land uses." 103 F.3d at 817. Unlike *Outdoor Media,* the court in this case invalidated the ordinance because it gave officials unfettered discretion based on these "ambiguous and subjective reasons," because it contained "no limits on the authority of City officials to deny a permit," and because it allowed officials to deny an application "without offering any evidence to support the conclusion that a particular structure or sign is detrimental to the community." *Id.* at 818, 819.

Finally, in *G.K. Ltd. Travel,* the plaintiffs challenged a sign ordinance that required: "[S]igns must be compatible with other nearby signs, other elements of street and site furniture and with adjacent

structures. Compatibility shall be determined by the relationships of the elements of form, proportion, scale, color, materials, surface treatment, overall sign size and the size and style of lettering." 436 F.3d at 1082 n. 15. The ordinance required processing of an application within 14 days and provided for appeal of a denial to the city council. *Id.* at 1083. Moreover, the ordinance provided that "[a]pproval or denial of a [minor development permit] application shall be accompanied by written findings that explain the criteria and standards considered relevant to the decision, state the facts relied upon in rendering the decision and explain the justification for the decision based on the criteria, standards, and facts set forth." *Id.* (brackets in original).

Like *Outdoor Media,* the court in *G.K. Ltd. Travel* concluded that these facts sufficiently reigned in discretion so as to prevent any First Amendment violations. Specifically, the court reasoned that using "compatibility" as the standard for a permit denial was sufficiently definite because the term was defined in the ordinance and the ordinance contained specific factors upon which the city official could determine "compatibility," such as "form, proportion, scale, color, materials, surface treatment, overall sign size and the size and style of the lettering." *Id.* The court also reasoned that requiring prompt adjudication and requiring a specific statement of reasons for denial "ensures that the compatibility determination is properly limited in scope and allows the Sign Code to be 'enforceable on review.'" *Id.* (citing *Chicago Park Dist.,* 534 U.S. at 324, 122 S.Ct. 775).

■ As this Court has previously concluded, three considerations emerge from these cases to determine whether an ordinance confers unfettered discretion in violation of the First Amendment: (1)

whether the ordinance contains "reasonably specific" criteria on which a denial may rest; (2) whether the ordinance outlines objective factors to consider in denying an application under the "reasonably specific" criteria; and (3) whether the ordinance requires officials to "state the reasons for his or her decision to either grant or deny a permit so as to facilitate effective review of the official's determination," which allows the determination to be "enforceable on review." *See id.*; *Desert Outdoor*, 103 F.3d at 818–19.

The Court holds that the specific plan, supplemental use district, and development agreement exceptions contained in Sections 14.4.4(B)(9) and (11) fall much closer to the ordinance invalidated in *Desert Outdoor* than the ordinances upheld in *G.K. Ltd. Travel* and *Outdoor Media*, but that the relocation agreement exception in section 14.4.4(B)(11) does not grant the City unfettered discretion to deny signs based on content. The Court will discuss each of these exceptions in turn.

### a. Specific Plans that Permit off-Site and Supergraphic Signs

The City explains that it is required by state law to adopt a "general plan" that includes a land-use element that "designates the proposed general distribution and general location and extent of the uses of the land...." Cal. Govt.Code §§ 65300, 65302. A "specific plan" is used to implement and refine a city's "general plan," but must also be consistent with the City's general plan. *See id.* § 65450; *DeVita v. County of Napa*, 9 Cal.4th 763, 803, 38 Cal.Rptr.2d 699, 889 P.2d 1019 (1995). Specific plans are created by the City Council. Los Angeles City Charter § 558.[1]

■ The City first argues that a specific plan is not a permitting scheme, so Plaintiffs may not bring an unfettered discretion challenge. Yet the two cases the City cites for this proposition, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 781–82, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (White, Stevens, O'Connor, JJ., dissenting) and *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 894 (9th Cir. 2007), do not support this conclusion. In both of those cases, the laws at issue *were* permitting schemes, so the Courts never needed to decide the question posed by the City here. In any event, there is no logical or legal reason to limit unfettered discretion challenges only to statutes that, on their face, are explicit permitting schemes. Unfettered discretion can come in many forms, but its hallmark is the grant of authority to approve or deny speech with a concomitant failure to adopt standards to cabin that authority to decisions based on factors other than the content of speech. *See City of Lakewood*, 486 U.S. at 759, 108 S.Ct. 2138 ("Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech."). To limit these challenges to pure licensing schemes would simply push cities and states to adopt creative measures that do not, on their face, look much like traditional permitting or licensing ordinances, but still grant officials unfettered discretion to allow or deny speech based on its content. As discussed below, this case is a perfect example of a non-traditional scheme that nevertheless creates broad unfettered discretion to limit speech based on content. The Court rejects the City's contrary arguments.

■ Without providing details, the City next argues that, because a specific plan must be legislatively adopted and ap-

---

1. The Court takes judicial notice of this document.

plies only to specific geographic areas of the City, it passes First Amendment muster. The City has missed the point of Plaintiffs' challenge. Whether the specific plans apply to any particular geographic area is largely irrelevant if the City can adopt a specific plan with no discernable standards to cabin the City's discretion. In other words, the City can avoid the blanket ban on off-site and supergraphic signs simply by enacting a specific plan in a certain area, but there are no standards that would prevent the City from enacting a specific plan because it wishes to approve particular speech or a particular speaker, or conversely, decline to enact (or even repeal) a specific plan because it disagrees with particular speech or a particular speaker. This is the precise evil the prohibition on unfettered discretion was meant to prevent and the City has failed to demonstrate that this evil is absent here. *See id.*[2]

The City's analogy to *Outdoor Systems, Inc. v. City of Mesa,* 997 F.2d 604 (9th Cir.1993) is unavailing. That case involved a challenge to two sign ordinances, one of which imposed a blanket ban on all off-site signs and the other which restricted off-site signs in some parts of the City but not others. The City argues that this case supports its argument that a mere "geographic" restriction on off-site signs is valid. Even if that were true under *Outdoor Systems,* the City's specific plan exception goes far beyond a geographic limitation. True, a specific plan is defined by geo-

graphic boundaries, but nothing prevents the City from drawing those geographic boundaries so as to allow certain speech and speakers it favors and prohibit others it disfavors. The mere geographic limitation here does nothing to prevent the unfettered discretion that the First Amendment prohibits and *Outdoor Systems* did not address this specific question.

Plaintiffs have demonstrated a likelihood that they will prevail on their unfettered discretion challenge to the specific plan exception to the blanket ban on off-site and supergraphic signs.

b. *Supplemental Use Districts that Permit Off–Site and Supergraphic Signs*

Supplemental Use Districts ("SUDs") may only be created by the City Council and are designed to "regulate and restrict the location of certain types of uses whose requirements are difficult to anticipate and cannot adequately be provided for in the 'Comprehensive Zoning Plan.'" LAMC § 12.32 C, S1(a).[3] The type of SUD at issue here is called a "sign district." *Id.* § 12.32 S1(b). The LAMC imposes some restrictions on where these districts can be created:

(1) they may only be established where "high intensity uses" are permitted, which include "only properties in the C [commercial] or M [industrial] Zones, except that R5 [multiple dwelling] Zone properties may be included in a 'SN' sign district pro-

---

**2.** The Court also rejects the City's specious argument that the exceptions to the off-site and supergraphic sign ban do not create the risk of self-censorship. The risk of self-censorship is *always* present in an ordinance that grants a municipality unfettered discretion. *See City of Lakewood,* 486 U.S. at 758, 108 S.Ct. 2138 (requiring objective standards for approving speech because they add "an element of certainty fatal to self-censorship."). In any event, this risk is primarily relevant to

proving injury (and thus standing) to bring an unfettered discretion challenge without the municipality actually subjecting the plaintiff to the challenged law. Once the plaintiff can point to the risk of self-censorship, the relevant inquiry is whether objective standards exist to cabin unfettered discretion.

**3.** The Court takes judicial notice of this document.

vided that the R5 zoned lot is located within an area designated on an adopted community plan as a 'Regional Center,' 'Regional Commercial,' or 'High Intensity Commercial,' or within any redevelopment project area"; and

(2) they may not "contain less than one block or three acres in area, whichever is the smaller."

*Id.* § 13.11B. The provision permitting the City to enact an SUD sign district provides that it must be "designed to enhance the theme or unique qualities of that district, or which eliminate blight through a sign reduction program." *Id.* § 13.11A. Most important:

> The sign regulations shall enhance the character of the district by addressing the location, number, square footage, height, light illumination, hours of illumination, sign reduction program, duration of signs, design and types of signs permitted, as well as other characteristics, and can include murals, supergraphics, and other on-site and off-site signs.

*Id.* § 13.11C.

The City first argues that this provision provides no discretion to grant or deny permission to erect signs within an SUD, but only the ability to create an SUD. According to the City, Plaintiffs should only challenge an SUD if it does not provide the appropriate objective criteria for allowing off-site and supergraphic signs. Again, the City misunderstands Plaintiffs' challenge. Certainly if Plaintiffs' signs are located within an SUD that does not provide the appropriate objective criteria for allowing signs, they may challenge it under the First Amendment. But here, Plaintiffs are challenging the lack of standards by which the City can create an SUD in the first place. Should the City wish to permit (or deny) the content of proposed signage or signs from a particular speaker,

Plaintiffs argue that the SUD exception to the ban on off-site and supergraphic signs allows it to do so simply by enacting (or repealing) an SUD.

At first glance, the guidelines in subsection C appear to save this provision and provide the necessary objective criteria to cabin discretion in SUDs and sign districts. As in *Outdoor Media* and *G.K. Ltd. Travel,* these specific guidelines are sufficiently concrete to provide little leeway in permitting signs and they contain objective criteria to guide officials' permitting decisions. Most important, these guidelines are concrete enough that an official is compelled to provide a specific, content-neutral reason for a permit denial and a court can easily review that decision to determine if it was made based upon the permissible criteria in subsection C or based upon impermissible content-based considerations.

 While this might end the Court's inquiry, the City has provided itself a loophole that eviscerates the standards it has set out in this provision: "However, the regulations for a 'SN' Sign District cannot supersede the regulations of an Historic Preservation Overlay District, *a legally adopted specific plan,* supplemental use district or zoning regulation needed to implement the provisions of an approved development agreement." LAMC § 13.11C (emphasis added). In other words, even though the City may create a sign district, it may also eliminate that sign district (and its attendant permitting guidelines) simply by enacting a specific plan. The Court has invalidated the specific plan exception above, and this "exception to the exception" that can change a sign district into a district covered by a specific plan must also be invalidated. The City has set up a system that allows it to eliminate speech based on content, despite the objective criteria contained in the sign district provi-

sion, and it cannot stand. Therefore, Plaintiffs have demonstrated a likelihood of success for their unfettered discretion challenge to this exception to the blanket off-site and supergraphic sign ban.

### c. *Development Agreement Exception*

As the specific plan exception goes, so goes the development agreement exception. A development agreement essentially freezes development laws at the time the agreement is executed. *See* Cal. Govt. Code § 65866 ("Unless otherwise provided by the development agreement, rules, regulations, and official policies governing permitted uses of the land, governing density, and governing design, improvement, and construction standards and specifications, applicable to development of the property subject to a development agreement, shall be those rules, regulations, and official policies in force at the time of execution of the agreement."). Notably, "[a] development agreement shall not be approved unless the legislative body finds that the provisions of the agreement are consistent with the general plan and any applicable specific plan." *Id.* § 65867.5(b).

The Court has invalidated the specific plan exception to the blanket off-site and supergraphic sign ban, and that provision takes down the development agreement exception with it. The specific plan legislative mechanism allows the City to enact a specific plan to allow or deny signs without objective criteria, and because a development agreement must be consistent with that specific plan, it too is not cabined by specific objective criteria to permit or deny signs.

 The Court notes that, other than its contingency on a specific plan, this provision appears to be valid and unrelated to restricting speech. Plaintiffs argue that California Government Code section 65865.2 allows the City to restrict speech

because the development agreement "may include conditions, terms, restrictions and requirements for subsequent discretionary actions." However, the Court finds Plaintiffs' concerns unlikely under this provision. This statute governs the terms of any agreement and the Court can presume that, under this provision, the City will not include terms that would allow it to restrict speech based on its content. Moreover, even though the statute allows the City to adopt restrictions for subsequent discretionary actions, a development agreement is still an agreement, subject to at least some negotiation, so any potential risk of the City reserving discretion to deny signs based on content will likely fail in that negotiation process. Other than the express recognition of a potentially invalid specific plan, this development agreement exception to the ban on off-site and supergraphic signs is more properly subject to an as-applied challenge between the City and a signatory to the agreement. Plaintiffs have not mounted that challenge here. Therefore, although the provision is otherwise valid, Plaintiffs have nevertheless demonstrated a likelihood of success in their unfettered discretion challenge to this provision because the development agreement exception can be tied to the specific plan exception.

### d. *Relocation Agreement Exception for Off–Site Signs Under Section 14.4.4(B)(11)*

Off-site signs are also exempt from the blanket ban pursuant to "a relocation agreement entered into pursuant to California Business and Professions Code Section 5412." LAMC § 14.4.4(B)(11). California Business and Professions Code section 5412 provides that local governments may not order legally permitted off-site outdoor advertising sign to be removed without paying compensation un-

der California's eminent domain law. However, to "allow local entities to continue development in a planned manner without expenditure of public funds while allowing the continued maintenance of private investment and a medium of public communication," section 5412 empowers cities "to enter into relocation agreements on whatever terms are agreeable to the display owner and the city, county, city and county, or other local entity, and to adopt ordinances or resolutions providing for relocation of displays."

Plaintiffs' unfettered discretion challenge to this exception is problematic for two reasons. First, section 5412 protects off-site signs by providing cities and counties an option to enter into a relocation agreement in lieu of exercising the eminent domain power. As a result, a speaker may be required to move signage, but it may still engage in commercial speech. Second, the provision applies only to signs that have already been permitted or erected, so speakers subject to this provision were permitted to erect their message in the first instance. Nothing in this exception suggests that the City has the ability, let alone the discretion, to deny signs based on message.

 Plaintiffs nevertheless argue that a relocation agreement must be "agreeable" to the City, and, therefore, this grants the City unfettered discretion to · restrict speech. But this provision must be read in the context of section 5412, which is to provide an option in lieu of taking property under the eminent domain law. If the relocation agreement is not "agreeable" to the sign owner or the city or county, then the sign may be taken.[4] This provision does not provide unfettered discretion to deny speech based on con-

tent. Therefore, Plaintiffs have failed to demonstrate a likelihood to succeed on their unfettered discretion challenge to this exception.

### 2. *Severability of the Exceptions in Section 14.4.4(B)(9), (11)*

 The Court has found the exceptions in section 14.4.4(B)(9) and three of the four exceptions in section 14.4.4(B)(11) invalid, so the Court must determine whether these provisions are severable from the City's blanket ban on all off-site and supergraphic signs. The Court must look to state law to determine whether a provision is severable. *See Qwest Commc'ns, Inc. v. City of Berkeley*, 433 F.3d 1253, 1259 (9th Cir.2006). "Under California law, the presence of a severability clause coupled with the ability functionally, mechanically, and grammatically to sever the invalid portion from the valid portions of an enactment ordinarily will allow severance but only if the remainder of the enactment is complete in itself and would have been adopted without the invalid portion." *Id.* If the law contains a severability clause, the Court still must look to these factors. *See MHC Fin. Ltd. P'ship Two v. City of Santee*, 125 Cal. App.4th 1372, 1393, 23 Cal.Rptr.3d 622 (2005) ("When the ordinance contains a severability clause, an invalid provision is severable if it is grammatically, functionally, and volitionally separable."); *Metromedia, Inc. v. City of San Diego*, 32 Cal.3d 180, 190, 185 Cal.Rptr. 260, 649 P.2d 902 (1982) (*Metromedia II* ) (stating that, even in light of a severability clause, "[t]he final [severability] determination depends on whether the remainder ... is complete in itself and would have been adopted by the legislative body had the latter forseen [sic]

---

**4.** Whether this is permissible under the First Amendment is far beyond the issues presented

in this case.

the partial invalidation of the statute ... or constitutes a completely operative expression of the legislative intent ... [and] are [not] so connected with the rest of the statute as to be inseparable." (internal citations omitted; ellipses and brackets in original)). If any one of these three requirements is not met, then the provision is not severable. *See, e.g., People v. Library One, Inc.,* 229 Cal.App.3d 973, 989, 280 Cal.Rptr. 400 (1991) (declining to address volitional severability because the invalid provision was not functionally severable). Plaintiffs contend that the invalid exceptions to the blanket off-site and supergraphic sign bans are not functionally and volitionally severable, and the Court agrees.[5]

■ A provision is functionally severable if the remaining provisions "stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to the [invalid provisions] by policy considerations." *Id.* The sign ordinance was enacted specifically to "promote public safety and welfare" by regulating the design and construction of signs, on the one hand, and "equalizing the opportunity for messages to be displayed" on the other. LAMC § 14.4.1. The detail of the sign ordinance itself suggests that the City sought to strike this balance between permitting commercial messages and preserving the safety and aesthetics of the City. Severing the exceptions in the ban on off-site and supergraphic signs would upset this policy balance that the City attempted to achieve and would, in effect, cause the Court to legislate a blanket ban that the City did not itself enact. *See Metromedia II,* 32 Cal.3d at 191, 185 Cal.Rptr. 260, 649 P.2d 902 (refusing to sever invalid billboard pro-

visions because doing so would "leave the city with an ordinance different than it intended"). The City's interests lie in balancing the dissemination of messages against the preservation of safety and aesthetics, and severing the exceptions to these blanket bans would upset that balance.

Likewise, these exceptions are not volitionally severable because the City likely would not have enacted these blanket bans had it foreseen that their exceptions would be invalidated. *See Mendoza v. California,* 149 Cal.App.4th 1034, 1063, 57 Cal. Rptr.3d 505 (2007). While the City sought to ban off-site and supergraphic signs, it clearly did not intend for those bans to eliminate all of these signs. In fact, the City seems to have utilized the exceptions to these bans numerous times and in numerous areas to generate revenue for the City, probably reaching into the millions of dollars. Invalidating these exceptions but not the blanket bans would, with a stroke of the Court's pen, eliminate these revenue streams. Nothing in the sign ordinance suggests that the City would have imposed blanket bans, although permitted, *see Outdoor Systems,* 997 F.2d at 611, at the expense of its ability to allow some signs and not others.

The City also sent only a weak legislative signal that these exceptions may be severed by enacting a mere general severability clause. *See* LAMC § 11.00(k). As Plaintiffs correctly point out, despite this provision, the City has routinely tacked on specific severability clauses to individual code provisions. *See, e.g.,* LAMC § 12.70(F) (Adult Entertainment Zoning); § 16.05(J) (Site Plan Review); § 41.23.6 (Trespass on Housing Authority Property). Given the clear legislative intent to strike a

5. The parties agree that the exceptions are grammatically severable because they "can be cleanly excised from the remainder of the statute without affecting the wording of any other provision." *National Broiler Council v. Voss,* 44 F.3d 740, 749 (9th Cir.1994).

balance between permitted and prohibited signage, the Court can presume that the City would have specifically enacted a severability clause somewhere in the sign ordinance as it did elsewhere if it harbored a desire to enact the blanket bans absent their exceptions. *Cf. Sanford v. Memberworks, Inc.,* 483 F.3d 956, 965 (9th Cir. 2007) ("Where Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Severing the invalid exceptions here is particularly inappropriate because it would effectively require "the State to restrict *more* speech than it currently does." *Rappa v. New Castle Cty.,* 18 F.3d 1043, 1072–73 (3d Cir.1994) (emphasis in original). In *Rappa,* the court found invalid several exceptions to a ban on commercial signs within 25 feet of any public highway, but declined to sever those provisions from the blanket ban because the net effect would restrict more speech than the county had originally intended. The court noted that the severability question had a "constitutional dimension": "We refuse to strike down the exception in part because of the special status of speech in our constitutional scheme, a scheme which generally favors more speech." *Id.* at 1073. The court also recognized the disincentives created by severing the invalid exceptions because, even if a litigant successfully challenges those invalid exceptions, it still would be unable to erect signs under the remaining blanket ban. *Id.* Notably, the court refused to cause such a result absent a much clearer legislative signal than a mere general severability clause (much like the one enacted by the City here). *Id.*

■■■ The Court concludes that the exceptions in section 14.4.4(9) and three of the four exceptions in section 14.4.4(11) are not severable from the blanket ban on off-site and supergraphic signs, so those entire provisions must be invalidated. However, because Plaintiffs have not demonstrated a likelihood of prevailing on the merits of their challenge to the relocation agreement exception in section 14.4.4(B)(11), the Court will not enjoin enforcement of that exception.

### 3. Likelihood of Prevailing on Central Hudson Challenge to Section 14.4.4(9), (11)

Although Plaintiffs seek an injunction based upon a *Central Hudson* challenge to section 14.4.4(B)(9) and (11), Plaintiffs have not included this claim in their complaint. The pleadings in this case have been in flux since January 2007. Plaintiffs have had at least two opportunities to amend their claims: first, following the City's motion to dismiss in July 2007; and second, after the Court amended the Scheduling Order and granted Plaintiffs leave to file an amended complaint. In its April 3, 2008 Order permitting Plaintiffs to file an amended complaint, the Court noted that "it will not entertain any further amendments, supplements, or changes to their complaint." Despite this comment, the Court set May 5, 2008 as the last day to amend pleadings. Plaintiffs sought no further amendments. It was incumbent on Plaintiffs to take advantage of any of these opportunities to advance whatever claims they had.

■■■ Plaintiffs' complaint makes perfectly clear that their sole challenge to section 14.4.4(B)(9) and (11) is one based on unfettered discretion. (First Amended Compl. ("FAC") ¶ 16.) Nowhere do Plaintiffs allege that these provisions fail as commercial speech restrictions, even though in their very next challenge to the Freeway Exposure provision they include a *Central Hudson* claim, which demon-

strates that they know how to plead a *Central Hudson* challenge when they want to. (*Id.* ¶¶ 17–18.) Nor do Plaintiffs state this claim by alleging only that the sign ordinance violates the First Amendment without tying those allegations to any specific provisions. (*See id.* ¶ 38.) As the Court construes Plaintiffs' complaint, no *Central Hudson* challenge to section 14.4.4(9) and (11) has been pled, so the Court cannot grant a preliminary injunction on this basis. *See Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994) (denying preliminary injunction because the preliminary injunction motion "is based on new assertions of mistreatment that are entirely different from the claim raised and relief requested in [plaintiff's] inadequate medical treatment lawsuit.").

#### 4. *Likelihood of Prevailing on Unfettered Discretion Challenge to Section 14.4.6*

▉ Plaintiffs argue that section 14.4.6 gives the City unfettered discretion to deny permits under this provision if it disagrees with the message.[6] The Ninth Circuit's decision in *Outdoor Media* forecloses this claim. Just as in *Outdoor Media*, the City's Freeway Exposure provision contains adequate guidelines to determine which signs are permitted. First, signs are generally banned within 2,000 feet of the freeway. Second, any permitted sign must not be primarily visible from the freeway, which is further defined. The Department of Building and Safety can understand what standards it must use in measuring primary visibility, and there is little risk that signs can (or will) be denied under this provision because of their content. Even

then, a court can easily review these decisions to determine whether any denial validly rested on "primary visibility" or on dislike of the speech. As the court noted in *Outdoor Media*, simply because the City is granted *some* leeway does not render this provision invalid. While admittedly granting more discretion than the guidelines in *Outdoor Media*, this provision does not run afoul of the First Amendment. Plaintiffs have failed to demonstrate a likelihood of success on the merits of this claim.

#### 5. *Likelihood of Prevailing on Central Hudson Challenge to Section 14.4.6*

Plaintiffs also challenge the Section 14.4.6 Freeway Exposure provision as an impermissible restriction on commercial speech. The Supreme Court's *Central Hudson* case set out the four-part test for regulating commercial speech: (1) whether the speech concerns lawful activity and is not misleading; (2) whether the restriction seeks to implement a substantial government interest; (3) whether the restriction directly advances that interest; and (4) whether the restriction reaches no further than necessary to accomplish the government's stated objectives. 447 U.S. at 566, 100 S.Ct. 2343. The City's stated interests in the Freeway Exposure provision are safety and aesthetics, which Plaintiffs do not challenge. Nor does the City argue that Plaintiffs' signs concern unlawful activity or are misleading. Rather, the parties dispute the last two prongs.

▉ The City's Freeway Exposure provision must have "a reasonable fit be-

---

**6.** Plaintiffs suggest that this provision is invalid because it is subject to the same improper exemptions as the ban on off-site signs. While the exemptions may be invalid, the Court must determine whether this provision, standing on its own, may validly prevent Plaintiffs from erecting their signs, even absent the invalid exceptions. *See Get Outdoors II v. Cty. of San Diego*, 506 F.3d 886 (9th Cir.2007).

tween the restriction and the goal" and must "include a means narrowly tailored to achieve the desired objective." *Ballen v. City of Redmond*, 466 F.3d 736, 742 (9th Cir.2006) (citations and quotations omitted). However, "[a] regulation need not be absolutely the least severe that will achieve the desired end, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the fit between ends and means is reasonable." *Id.* (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n. 13, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). Plaintiffs argue that, despite the prohibition on commercial signs within 2,000 feet of a freeway, the City routinely exempts some commercial signs from this restriction while permitting others, which violates the *Central Hudson* test.

Plaintiffs rely on *Ballen*, where the court invalidated a ban on portable and off-site signs under *Central Hudson* in part because the prohibition facially exempted certain other commercial signs from that prohibition. The *Ballen* court relied on *Discovery Network*, where the Supreme Court invalidated a law that prohibited all commercial news racks but allowed non-commercial news racks. The Court found that this selective ban created a distinction that had "no relationship *whatsoever* to the particular interests that the city has asserted" in safety and aesthetics. *Discovery Network*, 507 U.S. at 424, 113 S.Ct. 1505 (emphasis in original). The court in *Ballen* then focused on the several exceptions to the ban on off-site signs to conclude that those permitted signs posed no less of a traffic and safety hazard that the other signs banned under the ordinance. 466 F.3d at 743. The court also found the exceptions impermissibly content-based, which further undercut the ordinance's narrow tailoring. *See id.* at 743;

*Discovery Network*, 507 U.S. at 417, 113 S.Ct. 1505 (stating that, by enacting a content-based restriction, the city had "not carefully calculated the costs and benefits associated with the burden on speech imposed by its prohibition.").

The City relies on *Outdoor Systems, Inc. v. City of Mesa*, 997 F.2d 604 (9th Cir.1993) to argue that the Freeway Exposure provision is a valid blanket ban of off-site and supergraphic signs within 2,000 feet of a freeway. In that case, the plaintiffs challenged two ordinances, one in Tucson that classified signs as either on-site or off-site, limited the size and number of on-site signs, and limited off-site signs primarily to commercial and industrial areas and within certain zoning classifications of the city. *Id.* at 608. The plaintiffs also challenged an ordinance in the city of Mesa that distinguished between on-site and off-site signs and prohibited off-site signs entirely. *Id.* at 608. The Ninth Circuit upheld the Tucson ordinance because it limited regulation of off-site signs to the "noncommunicative aspects" of those signs and upheld both ordinances, despite certain exemptions, because it "does not follow from the fact that the [cities] have concluded that some commercial interests outweigh [their] municipal interests ... that [they] must give similar weight to all other commercial advertising." *Id.* at 611 (quoting *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512, 541, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion; Stevens, J., joining on this point)). Most important, the court found these ordinances reasonably fit with the cities' traffic safety and aesthetics concerns because "the cities have stopped short of achieving their goals because they have not banned outdoor signs entirely." *Id.* (citing *Metromedia*, 453 U.S. at 508, 101 S.Ct. 2882).

Neither *Ballen* nor *Outdoor Systems* quite answers the question posed by Plaintiffs, however. Here, Plaintiffs are not challenging the Freeway Exposure sign as facially discriminating against commercial messages, the primary issue in *Ballen* and *Outdoor Systems*. Rather, Plaintiffs here claim that the way in which the City has *applied* the Freeway Exposure ban discriminates against certain commercial speech and speakers, some of which the City has approved and some of which the City has prohibited. *See Desert Outdoor Advertising, Inc. v. City of Oakland*, 506 F.3d 798, 805 (9th Cir.2007) (noting that an as-applied challenge involves "*discriminatory enforcement* of a speech restriction [that] amounts to viewpoint discrimination in violation of the First Amendment. It is for this reason that a successful as-applied challenge does not render the law itself invalid, but only the particular application of the law. An as-applied challenge goes to the nature of the application rather than the nature of the law itself.").

For this as-applied challenge, Plaintiffs properly rely on *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999), where the Supreme Court invalidated commercial speech regulations that the government justified by pointing to specific interests even though those interests were directly undermined by other governmental policies. In that case, the FCC had banned advertising featuring privately owned commercial casino gambling. *Id.* at 180, 119 S.Ct. 1923. The FCC refused to permit New Orleans broadcasters to run private gambling advertising because the broadcast signals could reach into states where gambling was prohibited and undermined the government's interest in preventing the spread of casino gambling and the social costs attached to these activities. *Id.* The Court ultimately invalidated this ban because it did not reason-ably fit the government's interests. *Id.* at 189, 119 S.Ct. 1923. The government maintained a clear policy of giving "simultaneous encouragement of tribal casino gambling," which worked directly at cross purposes with its stated interest in preventing the spread of gambling and the attendant societal ills. *Id.* "[A]ny measure of the effectiveness of the Government's attempt to minimize the social costs of gambling cannot ignore Congress' simultaneous encouragement of tribal casino gambling, which may well be growing at a rate exceeding any increase in gambling or compulsive gambling that private casino advertising could produce." *Id.* Absent a reasonable fit between the government's ban and its stated interests, the commercial speech ban did not survive the application of *Central Hudson*. *Id.* at 195, 119 S.Ct. 1923.

The district court in *Metro Lights, LLC v. City of Los Angeles*, 488 F.Supp.2d 927 (C.D.Cal.2006) applied this "cross purposes" principle to invalidate the City's ban on newly constructed off-site signs for the purposes of safety and aesthetics, since the City simultaneously allowed thousands of off-site signs under an exclusive contract with a single speaker. *Id.* at 943. The Court relied on *Greater New Orleans* to conclude that "[t]he City, on the one hand, enacted the Sign Ordinance for the express purpose of promoting traffic safety and eliminating visual clutter, while, on the other hand, awarded a large contract that permits its contractor to do precisely what its Ordinance prohibits. In short, the two operate at cross purposes." *Id.* at 945. This meets neither *Central Hudson*'s third prong of advancing the City's interests nor the fourth prong of reasonable fit. *Id.* at 947–50.

■ Like the plaintiffs in *Greater New Orleans* and *Metro Lights*, Plaintiffs here

have persuasively demonstrated that, despite the City's interests in safety and aesthetics that support its ban on signs within 2,000 feet of a freeway, the City has permitted giant commercial billboards in these areas that directly undermine those interests. Plaintiffs point to five specific examples: an electronic sign near Staples Center; billboards in the 15th Street Signage Supplemental Use District; a 10,000 square foot supergraphic sign at 939 S. Figueroa Street; the "Freeway Overture" sign, depicting members of the Los Angeles Chamber Orchestra; and a sign at 1100 Wilshire Boulevard. The first three examples directly support Plaintiffs' argument, which is sufficient to demonstrate a First Amendment violation.

The electronic pole sign at the Staples Center changes messages frequently and can easily be seen from both directions of the 110 Harbor Freeway. This sign was permitted 10 years ago pursuant to an ordinance that required, in exchange for the signs permitted, that the applicant remove "nine (9) off-site signs and approximately forty (40) additional on-site signs", resulting in fewer signs at that location. However, the Freeway Exposure provision was in force at that time, and this ordinance permitting the Staples center sign exempted this specific land owner from its prohibition. This is precisely the First Amendment evil both *Greater New Orleans* and *Metro Lights* prohibited. Plaintiffs submitted an expert declaration from a traffic engineer that makes clear what is already common sense: electronic signage, with its changing messages, can create traffic hazards. (Declaration of William Kunzman ¶ 2, Ex. B.)[7] *See Metro Lights*, 488 F.Supp.2d at 944 (discussing Mr. Kunzman's experience and opinions, but noting that "this evidence is not necessary

to the Court's ruling since [Mr. Kunzman's traffic hazard] study tends to confirm what common sense suggests," i.e., that "[i]f a sign is in the field of vision of a driver ... it will have the potential of distracting the driver from his or her primary task of safely operating the vehicle."). That erecting this sign might also reduce the number of other signs in and around the Staples Center is irrelevant; the City does not indicate whether these removed signs were within 2,000 feet of the 110 freeway and, in any event, preserving even one freeway-facing sign still undermines the City's stated interests in traffic safety and aesthetics.

The billboards in the 15th Street Signage Supplemental Use District suffer from a similar flaw. The City argues that this SUD was created pursuant to a relocation agreement entered pursuant to California Business and Professions Code section 5412 and that it results in the reduction of 16 billboards along Santa Monica Boulevard in exchange for four billboards permitted in the SUD. The Court cannot determine whether this reduction generally furthered the City's interests in traffic safety and aesthetics because the City has failed to indicate where the other 16 billboards were located. If they did not fall within the Freeway Exposure ban, the Court can see little advancement of traffic safety by removing those 16 (which did not implicate freeway traffic safety) and erecting four billboards that now face a freeway. Again, even so, the signs facing the freeway directly undermine the City's stated concerns of traffic safety and aesthetics.

Plaintiffs also point to a gigantic 10,000 square foot commercial sign at 939 S. Figueroa Street, which is located within 2,000 feet of the 110 freeway. The City has not explained (nor could it, consistent

---

7. Mr. Kunzman is a registered professional traffic safety engineer in California with 30 years of experience in the area. (Kunzman Decl. ¶ 2, Ex. A.)

with the Court's discussion above) why this sign is exempt from the Freeway Exposure ban, while other commercial signs are prohibited.[8]

Therefore, Plaintiffs have demonstrated a likelihood of success on their *Central Hudson* challenge to the City's Freeway Exposure provision. While the City has valid interests in preserving traffic safety and aesthetics, it has permitted multiple commercial signs within 2,000 feet of freeway that directly undermine those interests. The City cannot work at these "cross purposes," so the Freeway Exposure provision fails the third and fourth prongs of the *Central Hudson* test.

### 6. *Irreparable Harm*

■■■ When a plaintiff demonstrates a likelihood of prevailing on the merits of a First Amendment challenge, irreparable injury is presumed. *See Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury for purposes of the issuance of a preliminary injunction." (internal quotations omitted)). The Court finds that Plaintiffs will suffer irreparable injury to their rights if the City is not enjoined from enforcing LAMC section 14.4.4(B)(9), (11), and section 14.4.6 against them and their signs.

### C. Conclusion

Plaintiffs have demonstrated a likelihood of prevailing on the merits of their unfettered discretion challenges to the exceptions to the supergraphic signs in LAMC section 14.4.4(B)(9) and three of the four

exceptions to the ban on off-site signs in LAMC section 14.4.4(B)(11), which are not severable from the blanket bans on off-site and supergraphic signs. Plaintiffs have also demonstrated a likelihood of prevailing on their *Central Hudson* challenge to the LAMC section 14.4.6 "Freeway Exposure" provision. Plaintiffs have also demonstrated irreparable harm in the absence of an injunction. Therefore, the City is ENJOINED from enforcing LAMC section 14.4.4(B)(9), LAMC section 14.4.4(B)(11) (except for the valid exception for relocation agreements), and LAMC section 14.4.6 against Plaintiffs.

## III. MOTION TO DISMISS

Although the outcome of the City's motion to dismiss is largely dependent on the Court's decision above, the Court addresses the City's motion briefly below.

### A. Legal Standard

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988); *accord Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248 (9th Cir.1997) ("A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") A court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from

**8.** The City argues that the "Harbor Freeway Overture" mural is not a commercial sign and not subject to the same Freeway Exposure ban on commercial speech. The Court need not decide this question because, even absent this sign, Plaintiffs have demonstrated that

other exceptions undermine the Freeway Exposure provision. The Court finds that Plaintiffs' arguments regarding 1100 Wilshire Boulevard are irrelevant because the signs in that location were erected in 1997 and 1998, and have long since been removed.

them. *See NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *see also Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir.1980) (finding that the complaint must be read in the light most favorable to the plaintiff). However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast as factual allegations. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 973 (8th Cir.1968).

## B. Discussion

### 1. *Unfettered Discretion Challenges to Section 14.4.4(B)(9), (10) and (11) Discussed Above*

The City moves to dismiss Plaintiffs' challenge to section 14.4.4(B)(9), (10) [9], and (11) that the exceptions in these provisions grant officials unfettered discretion. The Court granted Plaintiffs' motion for a preliminary injunction on this claim, so Plaintiffs have also stated a claim for relief and the City's motion to dismiss this claim is DENIED, except as to the relocation agreement exception. Because this is a legal claim and Plaintiffs cannot demonstrate a likelihood of prevailing on the merits of this claim, the Court DISMISSES Plaintiffs' unfettered discretion challenge to this exception WITH PREJUDICE.

### 2. *Central Hudson Challenges to Section 14.4.4(B)(9), (10), and (11)*

As discussed above, Plaintiffs have failed to allege a *Central Hudson* challenge to section 14.4.4(B)(9), (10) and (11), so the City's request to dismiss this claim is DENIED as MOOT.

### 3. *Unfettered Discretion and Central Hudson Challenges to Section 14.4.6 Discussed Above*

The Court above denied Plaintiffs' unfettered discretion challenge to Section 14.4.6 Freeway Exposure provision. This is a purely facial challenge to the "viewed primarily from" criterion in the statute, and because the Court holds that this provision, on its face, does not grant the City unfettered discretion in denying speech, this claim must be DISMISSED WITH PREJUDICE, as amending this claim would be futile.

However, because the Court concludes that Plaintiffs would likely prevail on their as-applied *Central Hudson* challenge to the City's application of this provision to some signs but not others, the Court DENIES the City's motion to dismiss this claim.

### 4. *Challenge to Sign Regulations as Discriminatory Against Non–Commercial Speech*

 The City moves to dismiss paragraph 38(a) of Plaintiffs' FAC, which states: "[t]he sign ordinance impermissibly discriminates in favor of commercial speech, which is permitted on premises, over noncommercial speech, which is generally prohibited or severely restricted." Plaintiffs do not defend this provision, nor could they. Neither the City nor the Court can discern what this challenge is or to which provisions it is directed. The Court DISMISSES this claim under Rule 8(a) WITH PREJUDICE. Plaintiffs have had ample opportunity to plead this claim adequately and have not done so.

### 5. *FAC Paragraph 34 and Permit Denials*

Plaintiffs also allege: "some permit applications for signs the City has recently

---

9. Subsection (10) imposes a blanket ban on "mural" signs, but imposes the same exceptions as subsection (9)'s ban on supergraphic signs. *See* Section 14.4.4(B)(10)

received have been returned bearing the following notation: *'Metro Lights, LLC v. City of Los Angeles* Case No. CV 04–1037 GAF (Ex) is under appeal in state court <sic> 9th Circuit, no action can be taken prior to outcome of appeal.'" (FAC ¶ 34.) The City moves to dismiss this allegation because Plaintiffs never received a denial bearing this language. Plaintiffs have not opposed so the Court DISMISSES paragraph 34 from the FAC.

### C. Conclusion and Remaining Claims

The Court DISMISSES Plaintiffs' unfettered discretion challenge to section 14.4.6 and Plaintiffs' claim of discrimination against non commercial speech in paragraph 38(a). The Court also DISMISSES Plaintiffs' unfettered discretion challenge to the relocation agreement exception in section 14.4.4(B)(11) WITH PREJUDICE. The Court also DISMISSES paragraph 34 of the FAC. The Court construes Plaintiffs' FAC as omitting any *Central Hudson* challenge to section 14.4.4(B)(9), (10), and (11).

In an effort to guide future litigation in this case, the Court also construes Plaintiffs' FAC here to include *only* these remaining claims (some of which support the preliminary injunction imposed above):

- Facial unfettered discretion challenge to section 14.4.4(B)(9), (10), and (11) (FAC ¶ 16);
- As-applied *Central Hudson* challenge to section 14.4.6 (FAC ¶¶ 17–18);
- As-applied challenge to the City's discriminatory designation of signs as "wall signs," "supergraphics," "mural

signs," and "off-site signs" (FAC ¶¶ 14–15) (not subject to these motions);
- Facial unfettered discretion challenge to the Cultural Affairs Commission's power to grant or deny permits (FAC ¶¶ 23–25) (not subject to these motions); and
- Facial unfettered discretion challenge to the Community Redevelopment Agency's power to grant or deny permits (FAC ¶ 26) (not subject to these motions).[10]

**IT IS SO ORDERED.**

---

10. Plaintiffs have attempted to plead that the Cultural Affairs Commission and the Community Redevelopment Agency have *actually* discriminated in granting or denying permit applications, but Plaintiffs have not pled any facts to support these claims. In an effort to salvage them, however, the Court construes them as facial unfettered discretion challenges to these agencies' *power* to grant or deny permits without objective standards, not their exercise of that power against Plaintiffs.